

# Terms and Conditions

**Go North Group AB (publ)**

**Maximum of equivalent to SEK 550,000,000**

**Senior Secured Fixed Rate Bonds**

SEK Tranche Bonds ISIN: NO0012829847

USD Tranche Bonds ISIN: NO0012829854

Originally dated 6 February 2023
as amended and restated on 26 February 2024

**Other than the registration of the Bonds under Swedish law, no action is being taken in any jurisdiction that would or is intended to permit a public offering of the Bonds or the possession, circulation or distribution of this document or any other material relating to the Issuer or the Bonds in any jurisdiction where action for that purpose is required. Persons into whose possession this document comes are required by the Issuer to inform themselves about, and to observe, any applicable restrictions.**

ROSCHIER

**PRIVACY NOTICE**

The Issuer, the Security Agent, the Paying Agent and the Agent may collect and process personal data relating to the Bondholders, the Bondholders' representatives or agents, and other persons nominated to act on behalf of the Bondholders pursuant to the Finance Documents (name, contact details and, when relevant, holding of Bonds). The personal data relating to the Bondholders is primarily collected from the registry kept by the CSD. The personal data relating to other persons is primarily collected directly from such persons.

The personal data collected will be processed by the Issuer, the Security Agent, the Paying Agent and the Agent for the following purposes:

(a)     to exercise their respective rights and fulfil their respective obligations under the Finance Documents;

(b)     to manage the administration of the Bonds and payments under the Bonds;

(c)     to enable the Bondholders to exercise their rights under the Finance Documents; and

(d)     to comply with their obligations under applicable laws and regulations.

The processing of personal data by the Issuer, the Security Agent, the Paying Agent and the Agent in relation to paragraphs (a) - (c) above is based on their legitimate interest to exercise their respective rights and to fulfil their respective obligations under the Finance Documents. In relation to paragraph (d) above, the processing is based on the fact that such processing is necessary for compliance with a legal obligation incumbent on the Issuer, the Security Agent, the Paying Agent or the Agent. Unless otherwise required or permitted by law, the personal data collected will not be kept longer than necessary given the purpose of the processing.

Personal data collected may be shared with third parties, such as the CSD, when necessary to fulfil the purpose for which such data is processed.

Subject to any legal preconditions, the applicability of which have to be assessed in each individual case, data subjects have the rights as follows. Data subjects have right to get access to their personal data and may request the same in writing at the address of the Issuer, the Security Agent, the Paying Agent and the Agent, respectively. In addition, data subjects have the right to (i) request that personal data is rectified or erased, (ii) object to specific processing, (iii) request that the processing be restricted and (iv) receive personal data provided by themselves in machine-readable format. Data subjects are also entitled to lodge complaints with the relevant supervisory authority if dissatisfied with the processing carried out.

The Issuer's, the Security Agent's, the Agent's and the Paying Agent's, and the contact details for their respective Data Protection Officers (if applicable), are found on their websites.

## Table of Contents

| | | |
|---|---|---|
| 1. | Definitions and Construction | 1 |
| 2. | Status of the Bonds | 15 |
| 3. | Use of Proceeds | 16 |
| 4. | [Reserved] | 16 |
| 5. | Bonds in Book-Entry Form | 16 |
| 6. | Right to Act on Behalf of a Bondholder | 16 |
| 7. | Payments in Respect of the Bonds | 17 |
| 8. | Interest | 18 |
| 9. | Redemption and Repurchase of the Bonds | 19 |
| 10. | Transaction Security and Guarantees | 23 |
| 11. | Information to Bondholders | 24 |
| 12. | Financial Undertakings | 26 |
| 13. | General Undertakings | 27 |
| 14. | Events of Default and Acceleration of the Bonds | 33 |
| 15. | Distribution of Proceeds | 36 |
| 16. | Decisions by Bondholders | 37 |
| 17. | Bondholders' Meeting | 40 |
| 18. | Written Procedure | 41 |
| 19. | Amendments and Waivers | 41 |
| 20. | [Reserved] | 42 |
| 21. | Appointment and Replacement of the Agent and the Security Agent | 42 |
| 22. | Appointment and Replacement of the CSD | 47 |
| 23. | Appointment and Replacement of the Paying Agent | 47 |
| 24. | No Direct Actions by Bondholders | 47 |
| 25. | Prescription | 48 |
| 26. | Notices and Press Releases | 48 |
| 27. | Force Majeure and Limitation of Liability | 50 |
| 28. | Governing Law and Jurisdiction | 50 |

# 1. Definitions and Construction

## 1.1 Definitions

In these terms and conditions (the "**Terms and Conditions**"):

"**Account Operator**" means a bank or other party duly authorised to operate as an account operator pursuant to the relevant securities registration legislation and through which a Bondholder has opened a Securities Account in respect of its Bonds.

"**Accounting Principles**" means the generally accepted accounting principles, standards and practices in Sweden (including IFRS) as applied by the Issuer in preparing its annual consolidated financial statements.

"**Acquiring Group Company**" has the meaning set forth under Clause 13.14(b)(i).

"**Adjusted Nominal Amount**" means the Total Nominal Amount less the aggregate Nominal Amount of all Bonds owned by a Group Company or an Affiliate, irrespective of whether such Person is directly registered as owner of such Bonds.

"**Advance Purchase Agreements**" means (a) an advance or deferred purchase agreement if the agreement is in respect of the supply of assets or services in the normal course of business with credit periods which are no longer than 120 days after the supply of assets or services, or (b) any other trade credit incurred in the ordinary course of business where payment is due no more than 120 days after the date of trade.

"**Affiliate**" means any Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purpose of this definition, "**control**" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "**controlling**" and "**controlled**" have meanings correlative to the foregoing.

"**Agency Agreement**" means the agency agreement entered into prior to the First Issue Date, between the Issuer and the Agent, or any replacement agency agreement entered into after the First Issue Date between the Issuer and an agent.

"**Agent**" means Intertrust (Sweden) AB, reg. no. 556625-5476, P.O. Box 16285, SE-103 25 Stockholm, Sweden or another party replacing it, as Agent, in accordance with these Terms and Conditions.

"**Agreed Security Principles**" means the principles set out in Schedule 1 (*Agreed Security Principles*).

"**Amendment Date**" means the date when these Terms and Conditions was amended and restated, being 26 February 2024.

"**Backstop Fee Notes**" means the Issuer's fixed rate notes with ISIN NO0013148411 in an amount of up to SEK 15,000,000 plus capitalised interest ranking junior to the Bonds under the Intercreditor Agreement issued as backstop fee for the issue of the New Senior Secured Bonds.

"**Bond**" means (a) the debt instrument issued by the Issuer pursuant to these Terms and Conditions, including the Initial Bonds and any Subsequent Bonds, and (b) any overdue and unpaid principal which has been issued under a separate ISIN in accordance with the regulations of the CSD from time to time.

"**Bond Put Amount**" has the meaning set out in Clause 9.5(c).

"**Bondholder**" means the bondholders under the Bonds.

"**Bondholders' Meeting**" means a meeting among the Bondholders held in accordance with Clause 17 (*Bondholders' Meeting*).

"**Bond Exchange**" has the meaning set out in Clause 9.6 (*Bond Exchange*).

"**Bond Issue**" means the Initial Bond Issue and any Subsequent Bond Issue**.**

"**Business Day**" means a day in Sweden other than a Sunday or other public holiday. Saturdays, Midsummer Eve (Sw. *midsommarafton*), Christmas Eve (Sw. *julafton*) and New Year's Eve (Sw. *nyårsafton*) shall for the purpose of this definition be deemed to be public holidays.

"**Business Day Convention**" means the first following day that is a CSD Business Day.

"**Call Option Amount**" has the meaning set forth under Clause 9.3 (*Voluntary total redemption (call option)*).

"**Cash and Cash Equivalents**" means cash and cash equivalents in accordance with the Accounting Principles.

"**Cash Interest Rate**" means a fixed interest rate of 10.00 per cent *per annum.*

"**Change of Control Event**" means the occurrence of an event or series of events whereby:

(a)     eEquity (directly or indirectly) disposes of any of its shares in the Parent and/or the Issuer, other than to any of its Affiliates or in connection with an Equity Listing Event; or

(b)     one or more persons, other than eEquity (or an Affiliate thereof) or Johan Hallenby (directly or indirectly), acting in concert, acquire control, directly or indirectly, over more than 50 per cent. of the voting shares of the Issuer, or the right to, directly or indirectly, appoint or remove the whole or a majority of the directors of the board of directors of the Issuer.

"**Compliance Certificate**" means a certificate to the Agent, in the agreed form between the Agent and the Issuer, signed by the CFO, the CEO or an authorised signatory of the Issuer, certifying (as applicable):

(a)     that so far as it is aware no Event of Default is continuing or, if it is aware that an Event of Default is continuing, specifying the event and steps, if any, being taken to remedy it;

(b)     if the Compliance Certificate is provided in connection with an Incurrence Test, that the Incurrence Test is met (including figures in respect of the Incurrence Test and the basis on which they have been calculated); and/or

(c)     if the Compliance Certificate is provided in connection with that audited annual financial statements are made available, the Material Group Companies.

"**Compound Interest Rate**" means a fixed interest rate of 15.00 per cent *per annum*.

"**Convertible Instrument**" means the convertible bonds issued in the Issuer with ISIN SE0021514528.

"**CSD**" means the Issuer's central securities depository and registrar in respect of the Bonds, from time to time, initially Verdipapirsentralen ASA, Norwegian Reg. No. 985 140 421, Fred Olsens gate 1, NO-0152 Oslo, Norway.

"**CSD Business Day**" means a day on which the relevant CSD settlement system is open and the relevant Bond currency settlement system is open.

"**Default**" means an Event of Default or any event or circumstance specified in Clause 14 (*Events of Default and Acceleration of the Bonds*) which would (with the expiry of a grace period, the giving of notice, the making of any determination under the Finance Documents or any combination of any of the foregoing) be an Event of Default.

"**Deferred Payment Equity**" has the meaning set forth under the definition "Permitted Debt".

"**Disposing Group Company**" has the meaning set forth under Clause 13.14(b)(i).

"**EBITDA**" means, in respect of the Reference Period, the consolidated profit of the Group from ordinary activities according to the latest Financial Report(s):

(a)     before deducting any amount of tax on profits, gains or income paid or payable by any member of the Group;

(b)     before deducting any Net Finance Charges;

(c)     before taking into account any extraordinary items and any non-recurring items which are not in line with the ordinary course of business of the Group ("**Exceptional Items**"), in an aggregate amount not exceeding five per cent. of EBITDA of the relevant Reference Period (prior to any adjustments for Exceptional Items) (provided that any Exceptional Items in respect of Incremental Target EBITDA shall not be adjusted for twice);

(d)     before taking into account any Transaction Costs;

(e)     not including any accrued interest owing to any Group Company;

(f)     before taking into account any unrealised gains or losses on any derivative instrument (other than any derivative instruments which is accounted for on a hedge account basis);

(g) after adding back or deducting, as the case may be, the amount of any loss or gain against book value arising on a disposal of any asset (other than in the ordinary course of trading) and any loss or gain arising from an upward or downward revaluation of any asset (in each case, other than in the ordinary course of trading);

(h) after deducting the amount of any profit (or adding back the amount of any loss) of any Group Company which is attributable to minority interests;

(i) plus or minus the Group's share of the profits or losses of entities which are not part of the Group;

(j) after adding back any losses to the extent covered by any insurance and in respect of which insurance proceeds have been received by the Group; and

(k) after adding back any amount attributable to the amortisation, depreciation or depletion of assets of members of the Group.

"**eEquity**" means eEquity IV AB, Swedish reg. no. 559129-7725.

"**Equity Listing Event**" means an initial public offering of shares in the Issuer (or the Parent), after which such shares shall be admitted to trading on a Regulated Market or an MTF.

"**Equity Listing Proceeds**" has the meaning set out in Clause 9.5(b).

"**Event of Default**" means an event or circumstance specified in any of the Clauses 14.1 (*Non-Payment*) to and including Clause 14.10 (*Continuation of the Business*).

"**Exchange Rate**" means the SEK/USD exchange rate quoted on the Swedish Central Bank's website (www.riksbank.se) at 12:00 Swedish time on the First Issue Date.

"**Exchange SEK Bonds**" has the meaning set out in Clause 9.6(a).

"**Final Maturity Date**" means 9 February 2027.

"**Finance Charges**" means, for the Reference Period, the aggregate amount of the accrued interest, commission, fees, discounts, prepayment fees, premiums or charges and other finance payments in respect of Financial Indebtedness whether paid, payable or capitalised by any member of the Group according to the latest Financial Report(s) (calculated on a consolidated basis) other than Transaction Costs, any interest in respect of any loan owing to any member of the Group or capitalised interest in respect of any Shareholder Debt and taking no account of any unrealised gains or losses on any derivative instruments other than any derivative instrument which are accounted for on a hedge accounting basis.

"**Finance Documents**" means:

(a) these Terms and Conditions;

(b) the Agency Agreement;

(c)     the Security Documents;

(d)     the Guarantee and Adherence Agreement;

(e)     the Intercreditor Agreement; and

(f)     any other document designated by the Issuer and the Agent or the Security Agent as a Finance Document.

"**Finance Leases**" means any finance leases, to the extent the arrangement is or would have been treated as a finance or a capital lease in accordance with the Accounting Principles (a lease which in the accounts of the Group is treated as an asset and a corresponding liability).

"**Financial Indebtedness**" means any indebtedness in respect of:

(a)     monies borrowed or raised, including Market Loans;

(b)     the amount of any liability in respect of any Finance Leases;

(c)     receivables sold or discounted (other than any receivables to the extent they are sold on a non-recourse basis);

(d)     any amount raised under any other transaction (including any forward sale or purchase agreement) having the commercial effect of a borrowing;

(e)     any derivative transaction entered into in connection with protection against or benefit from fluctuation in any rate or price (and, when calculating the value of any derivative transaction, only the mark to market value shall be taken into account, provided that if any actual amount is due as a result of a termination or a close-out, such amount shall be used instead);

(f)     any counter indemnity obligation in respect of a guarantee, indemnity, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution; and

(g)     (without double counting) any guarantee or other assurance against financial loss in respect of a type referred to in the above paragraphs (a)-(f) above.

"**Financial Report**" means the Group's annual audited financial statements or quarterly interim unaudited reports, which shall be prepared and made available according to Clauses 11.1(a)(i) and 11.1(a)(ii).

"**First Call Date**" means the date falling 12 months after the First Issue Date.

"**First Issue Date**" means 9 February 2023.

"**Force Majeure Event**" has the meaning set forth in Clause 27(a).

"**Group**" means the Issuer and each of its Subsidiaries from time to time and "**Group Company**" means any of them.

**"Guarantee and Adherence Agreement"** means the guarantee and adherence agreement dated 3 March 2023 entered into between the Issuer, the Guarantors and the Agent pursuant to which the Secured Obligations have been guaranteed by the Guarantors (as amended from time to time).

**"Guarantees"** means the guarantees provided by the Guarantors under the Guarantee and Adherence Agreement.

**"Guarantor"** means each Group Company from time to time.

**"IFRS"** means international financial reporting standards (IFRS) within the meaning of Regulation 1606/2002/EC (or as otherwise adopted or amended from time to time).

**"Incremental Target EBITDA"** means, in respect of the Reference Period immediately prior to the relevant acquisition, the revenues of an acquired or disposed (as applicable) businesses from product sales, less costs for (a) production, purchase of goods and shipping, (b) fulfilment by Amazon (FBA) and selling fees and (c) ads and branding, adjusted for any Exceptional Items in an aggregate amount not exceeding five per cent. of Incremental Target EBITDA of the relevant Reference Period (prior to any adjustments for Exceptional Items).

"**Incurrence Test**" has the meaning set out in Clause 12.1 (*Incurrence Test*)

**"Initial Bond Issue"** means the issuance of the Initial Bonds.

**"Initial Bonds**" means the SEK Tranche Bonds issued on the First Issue Date.

**"Insolvent"** means, in respect of a relevant Person, that it is deemed to be insolvent, within the meaning of Chapter 2, Sections 7-9 of the Swedish Bankruptcy Act (Sw. *konkurslagen (1987:672)*) (or its equivalent in any other jurisdiction), admits inability to pay its debts as they fall due, suspends making payments on any of its debts or by reason of actual financial difficulties commences negotiations with its creditors with a view to rescheduling any of its indebtedness (including company reorganisation under the Swedish Company Reorganisation Act (Sw. *lag (1996:764) om företagsrekonstruktion*) (or its equivalent in any other jurisdiction)) or is subject to involuntary winding-up, dissolution or liquidation.

**"Intercreditor Agreement"** means the intercreditor agreement originally dated 20 March 2023 and as amended and restated on or about the Amendment Date entered into between, amongst others, the Issuer, the Guarantors, the lender under the Super Senior RCF and the Agent.

**"Interest"** means the interest on the Bonds calculated in accordance with paragraphs (a) to (h) of Clause 8 (*Interest*).

**"Interest Payment Date"** means 9 February, and 9 August each year. The last Interest Payment Date shall be the Final Maturity Date (or such earlier date on which the Bonds are redeemed in full). To the extent such day is not a CSD Business Day, the CSD Business Day following from an application of the Business Day Convention.

"**Interest Period**" means in respect of (a) the first Interest Period, the period from (and including) the First Issue Date to (but excluding) the first Interest Payment Date, (b) the first Interest Period for any Subsequent Bonds, the period from (and including) the Interest Payment Date falling immediately prior to the issuance of such Subsequent Bonds to (but excluding) the next succeeding Interest Payment Date (or a shorter period if relevant) and (c) subsequent Interest Periods, the period from (and including) an Interest Payment Date to (but excluding) the next succeeding Interest Payment Date (or a shorter period if relevant). An Interest Period shall not be adjusted due to an application of the Business Day Convention.

"**Interest Rate**" means if interest is payable in cash, the Cash Interest Rate or if interest is capitalised, the Compound Interest Rate.

"**Issuer**" means Go North Group AB (publ), a public limited liability company incorporated in Sweden with reg. no. 559252-2188.

"**Market Loan**" means any loan or other indebtedness where an entity issues commercial paper, certificates, subordinated debentures, bonds or any other debt securities (including, for the avoidance of doubt, medium term note programmes and other market funding programmes), provided in each case that such instruments and securities are or can be subject to trade on any Regulated Market, MTF or other unregulated recognised market place.

"**Material Adverse Effect**" means a material adverse effect on:

(a)     the business, financial condition or operations of the Group taken as a whole;

(b)     the ability of the Group taken as whole to comply with its obligations under the Finance Documents; or

(c)     the validity or enforceability of the Finance Documents.

"**Material Group Company**" means any Group Company (other than the Issuer) with:

(a)     revenues from product sales, less the costs for (i) production, purchase of goods and shipping, (ii) fulfilment by Amazon (FBA) and selling fees and (iii) ads and branding; or

(b)     assets,

representing five per cent. or more of the Group Companies' (excluding the Issuer):

(c)     consolidated revenues from product sales, less the costs for (i) production, purchase of goods and shipping, (ii) fulfilment by Amazon (FBA) and selling fees and (iii) ads and branding determined; or

(d)     total assets,

in each case by reference to the most recent audited annual financial statements.

**"Material Intercompany Loan"** means any intercompany loans provided by the Issuer to any Material Group Company where:

(a)     the term of the intercompany loan is at least twelve months; and

(b)     the principal amount, when aggregated with all other intercompany loans with a term of at least twelve months between such Group Company as creditor and the same Subsidiary as debtor, exceeds SEK 5,000,000 (or its equivalent in any other currency).

**"MTF"** means any multilateral trading facility as defined in the Markets in Financial Instruments Directive 2014/65/EU (MiFID II), as amended.

**"Net Finance Charges"** means, for the Reference Period, the Finance Charges according to the latest Financial Report(s), after deducting any interest payable for that Reference Period to any Group Company and any interest income relating to cash or cash equivalent investment (and excluding any interest capitalised on Shareholder Debt).

**"Net Interest Bearing Debt"** means the aggregate interest bearing Financial Indebtedness less Cash and Cash Equivalents of the Group including any committed deferred payment obligations (for the avoidance of doubt, excluding guarantees, counter-indemnities, Shareholder Debt, any claims subordinated pursuant to an intercreditor agreement on terms and conditions satisfactory to the Agent and interest bearing Financial Indebtedness borrowed from any Group Company).

**"Net Proceeds"** means the proceeds from a Bond Issue after deduction has been made for the Transaction Costs payable by the Issuer to the Sole Bookrunner (if the Sole Bookrunner has requested that its fees and costs shall be deducted) and the Paying Agent for the services provided in relation to the placement and issuance of the Bonds.

"**New Senior Secured Bonds**" means the Issuer's senior secured floating rate bonds with ISIN NO0013165845 and ISIN NO0013165852, respectively, in an amount of up to USD 26,180,000 plus capitalised interest ranking senior to the Bonds pursuant to the Intercreditor Agreement.

**"Nominal Amount"** means the Initial Nominal Amount (i) less any repayments and amortisations made in accordance with the Terms and Conditions and (ii) plus any interest capitalised in accordance with Clauses 8(c) and 8(e).

**"Obligors"** means the Issuer and each Guarantor.

**"Parent"** means Go North Group Holding AB, a limited liability company incorporated in Sweden with reg. no. 559378-6725.

**"Paying Agent"** means NT Services AS, or another party replacing it, as Paying Agent, in accordance with these Terms and Conditions.

**"Permitted Debt"** means any Financial Indebtedness:

(a)     incurred under the Bonds (except for any Subsequent Bonds);

(b)     incurred pursuant to any Finance Leases entered into in the ordinary course of the Group's business;

(c)     incurred by the Issuer under the Super Senior RCF (including Financial Indebtedness to the extent covered by a letter of credit, guarantee or indemnity issued under, or any ancillary facility relating to such Super Senior RCF), in each case in a maximum aggregate amount of USD 5,000,000;

(d)     related to any agreements under which the Issuer leases office space (Sw. *kontorshyresavtal*) or other premises;

(e)     arising under a foreign exchange transaction or a commodity transaction for spot or forward delivery entered into in connection with protection against fluctuation in currency rates or prices where the exposure arises in the ordinary course of business or in respect of payments to be made under the Terms and Conditions but not any transaction for investment or speculative purposes;

(f)     incurred by the Issuer or a Group Company under any deferred payment obligations and/or earn-out obligations in connection with acquisitions made by such Group Company, provided that (i) such deferred payment obligations and/or earn-out obligations are unsecured and non-interest bearing and (ii) that no payments may be made under such deferred payment obligations and/or earn-out obligations unless (A) such payment is funded with new equity injections (in the form of new issue of shares, unconditional shareholder contribution or Shareholder Debt) ("**Deferred Payment Equity**") or (B) the Incurrence Test is met (calculated *pro forma* as if the relevant payment had already been made);

(g)     under any guarantee issued by a Group Company (other than the Issuer) in the ordinary course of business;

(h)     under any guarantee issued by the Issuer;

(i)     incurred under any Shareholder Debt;

(j)     arising under any interest rate hedging transactions entered in to by the Issuer in respect of payments to be made under the Terms and Conditions, but not any transaction for investment or speculative purposes;

(k)     incurred under Advance Purchase Agreements;

(l)     incurred by the Issuer if such Financial Indebtedness (i) is incurred as a result of a Subsequent Bond Issue made as a result of a Bond Exchange or (ii) is subordinated to the obligations of the Issuer under the Finance Documents, yield only payment in kind interest and has a final maturity date or a final redemption date or when applicable, early redemption dates or instalment dates, in each case which occur after the Final Maturity Date;

(m)     incurred as a result of any Group Company acquiring another entity after the First Issue Date which entity already had incurred Financial Indebtedness but not incurred or increased or having its maturity date extended in contemplation

of, or since that acquisition, provided that such Financial Indebtedness is (i) repaid in full within three months of completion of such acquisition or (ii) refinanced in full within three months of completion of such acquisition with the Issuer as the new borrower;

(n)     taken up from a Group Company (including any cash pool arrangements);

(o)     arising under any credit card facility in the ordinary course of business;

(p)     incurred in connection with the redemption of the Bonds in order to fully refinance the Bonds and provided further that such Financial Indebtedness is subject to an escrow arrangement up until the redemption of the Bonds (taking into account the rules and regulations of the CSD), for the purpose of securing, inter alia, the redemption of the Bonds;

(q)     arising under any counter-indemnity obligation in respect of a guarantee, bond, standby or documentary letter of credit or any other instrument issued by a bank or financial institution in respect of an underlying liability in the ordinary course of business of a Group Company;

(r)     under any pension and tax liabilities in the ordinary course of business by any Group Company;

(s)     incurred under the New Senior Secured Bonds, the Backstop Fee Notes and the Convertible Instrument; and

(t)     any other Financial Indebtedness incurred by the Issuer not in aggregate exceeding SEK 5,000,000 (or the equivalent thereof in any other currency).

**"Permitted Security"** means any Security:

(a)     provided under the Finance Documents and otherwise as permitted pursuant to the Intercreditor Agreement;

(b)     arising by operation of law or in the ordinary course of business (including collateral or retention of title arrangements in connection with Advance Purchase Agreements but, for the avoidance of doubt, not including guarantees or security in respect of any monies borrowed or raised);

(c)     provided in relation to any lease agreement entered into by a Group Company;

(d)     provided over any assets being subject to a Finance Lease, permitted pursuant to paragraph (b) of the definition of "Permitted Debt";

(e)     provided for any guarantees issued by a Group Company in the ordinary course of business;

(f)     arising under any netting or set off arrangements under financial derivatives transactions or bank account arrangements, including group cash pool arrangements; and

(g)     provided pursuant to items (e), (j), (l), (m),(p), (q), (r) and (t) of the definition of "Permitted Debt".

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organisation, government, or any agency or political subdivision thereof or any other entity, whether or not having a separate legal personality.

"**Record Date**" means the date on which a Bondholder's ownership of Bonds shall be recorded in the CSD as follows:

(a)     in relation to payments pursuant to these Terms and Conditions, the date designated as the Record Date in accordance with the rules of the CSD from time to time;

(b)     for the purpose of casting a vote with regard to Clause 16 (*Decisions by Bondholders*), the date falling on the immediate preceding CSD Business Day to the date of that Bondholders' decision being made, or another date as accepted by the Agent; and

(c)     another relevant date, or in each case such other CSD Business Day falling prior to a relevant date if generally applicable on the Swedish bond market.

"**Redemption Date**" means the date on which the relevant Bonds are to be redeemed or repurchased in accordance with Clause 9 (*Redemption and Repurchase of the Bonds*).

"**Reference Date**" means 31 March, 30 June, 30 September and 31 December in each year for as long as any Bonds are outstanding.

"**Reference Period**" means each period of twelve consecutive calendar months.

"**Regulated Market**" means any regulated market as defined in the Markets in Financial Instruments Directive 2014/65/EU (MiFID II), as amended.

"**Restricted Payment**" has the meaning set forth in paragraph (a) of Clause 13.2 (*Restricted Payments*).

"**Secured Obligations**" has the meaning given thereto in the Intercreditor Agreement.

"**Secured Parties**" has the meaning given thereto in the Intercreditor Agreement.

"**Securities Account**" means the account for dematerialised securities maintained by the CSD pursuant to the relevant securities registration legislation in which (i) an owner of such security is directly registered or (ii) an owner's holding of securities is registered in the name of a nominee.

"**Security**" means a mortgage, charge, pledge, lien, security assignment or other security interest securing any obligation of any Person, or any other agreement or arrangement having a similar effect.

"**Security Agent**" means the security agent holding the Transaction Security on behalf of the Secured Parties, being Intertrust (Sweden) AB, reg. no. 556625-5476, P.O. Box 16285, SE-103 25 Stockholm, Sweden on the First Issue Date.

"**Security Documents**" means the security documents pursuant to which the Transaction Security is created and any other document designated as a Security Document by the Issuer and the Security Agent.

"**SEK Tranche Bonds**" means the Bonds with ISIN NO0012829847 denominated in SEK including any Subsequent Bonds issued in SEK.

"**Shareholder Debt**" means any shareholder loan made to the Issuer as debtor, if such loan:

(a) according to the Intercreditor Agreement is subordinated to the obligations of the Issuer under the Finance Documents;

(b) according to its terms has a final redemption date or, when applicable, early redemption dates or instalment dates which occur after the Final Maturity Date; and

(c) according to its terms yield only payment-in-kind interest and/or cash interest that is payable after the Final Maturity Date.

"**Sole Bookrunner**" means Pareto Securities AB.

"**Subsequent Bond Issue**" means an issue of Subsequent Bonds.

"**Subsequent Bonds**" means any Bonds issued after the First Issue Date on one or more occasions.

"**Subsidiary**" means, in respect of which such Person, directly or indirectly:

(a) owns shares or ownership rights representing more than 50 per cent. of the total number of votes held by the owners;

(b) otherwise controls more than 50 per cent. of the total number of votes held by the owners; or

(c) has the power to appoint and remove all, or the majority of, the members of the board of directors or other governing body.

"**Super Senior Debt**" has the meaning given thereto in the Intercreditor Agreement.

"**Super Senior RCF**" has the meaning given thereto in the Intercreditor Agreement.

"**Swedish Kronor**" and "**SEK**" means the lawful currency of Sweden.

"**Total Nominal Amount**" means the total aggregate Nominal Amount of the Bonds outstanding at the relevant time.

**"Transaction Costs"** means all fees, costs and expenses, stamp, registration and other taxes incurred by the Issuer or any other Group Company in connection with:

(a)     a Bond Issue;

(b)     the granting of any Transaction Security and/or Guarantee;

(c)     the listing of the Bonds; and

(d)     any acquisition.

**"Transaction Security"** means the Security provided for the Secured Obligations pursuant to the Security Documents and the Intercreditor Agreement, being:

(a)     as of the Amendment Date, a pledge in respect of all shares in the Issuer and each other Group Company;

(b)     a pledge in respect of all shares in each future Group Company, pursuant to Clause 13.9 (*Additional Security and Guarantees*);

(c)     a pledge over any Material Intercompany Loan as of the Amendment Date; and

(d)     a pledge over any Material Intercompany Loan pursuant to Clause 13.10 (*Additional Security Material Intercompany Loans*).

**"Transfer"** has the meaning set forth under Clause 13.14(b)(i).

**"USD"** means United States dollar, the currency for the United States of America.

**"USD Tranche Bonds"** means the Bonds with ISIN NO0012829854 denominated in USD, including any Subsequent Bonds issued in USD.

**"Written Procedure"** means the written or electronic procedure for decision making among the Bondholders in accordance with Clause 18 (*Written Procedure*).

## 1.2     Construction

(a)     Unless a contrary indication appears, any reference in these Terms and Conditions to:

    (i)     "assets" includes present and future properties, revenues and rights of every description;

    (ii)     any agreement or instrument is a reference to that agreement or instrument as supplemented, amended, novated, extended, restated or replaced from time to time;

    (iii)     a "regulation" includes any regulation, rule or official directive (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency or department;

(iv)    an Event of Default is continuing if it has not been remedied or waived;

(v)     a provision of law is a reference to that provision as amended or re-enacted;

(vi)    a time of day is a reference to Stockholm time; and

(vii)   Bonds being "redeemed" means that such Bonds are cancelled and discharged in the CSD in a corresponding amount, and that any amounts so redeemed may not be subsequently re-issued under these Terms and Conditions.

(b)    Subject to paragraph (e) below, when ascertaining whether a limit or threshold specified in Swedish Kronor has been attained or broken, an amount in another currency shall be counted on the basis of the rate of exchange for such currency against Swedish Kronor for the previous CSD Business Day, as published by the Swedish Central Bank (Sw. *Riksbanken*) on its website (www.riksbank.se). If no such rate is available, the most recently published rate shall be used instead.

(c)    When ascertaining whether a limit or threshold specified in USD has been attained or broken, an amount in another currency shall be counted on the basis of the rate of exchange for such currency against USD for the previous Business Day, as published by the US Federal Reserve System on its website www.federalreserve.gov. If no such rate is available, the most recently published rate shall be used instead.

(d)    A notice shall be deemed to be sent by way of press release if it is made available to the public within Sweden promptly and in a non-discriminatory manner.

(e)    Notwithstanding paragraph (b) above, at a Bondholders' Meeting or by way of a Written Procedure, the calculations of whether a quorum exists and if the relevant consent has been obtained, shall be made in SEK. Each Bond shall always entitle to one vote at a Bondholders' Meeting or by way of a Written Procedure. The value of the vote of each SEK Bond shall be the Nominal Amount and the value of the vote of each SEK Tranche Bond and USD Tranche Bond shall be the Nominal Amount of the SEK Tranche bond or USD Tranche Bond converted into SEK at the Exchange Rate. For the avoidance of doubt, the Adjusted Nominal Amount shall at all times be calculated based on the Exchange Rate.

(f)    No delay or omission of the Agent, the Security Agent or of any Bondholder to exercise any right or remedy under the Finance Documents shall impair or operate as a waiver of any such right or remedy.

(g)    The privacy notice and any other information contained in this document before the table of contents section do not form part of these Terms and Conditions and may be updated without the consent of the Bondholders, the Security Agent, the Paying Agent and the Agent.

## 2. Status of the Bonds

(a) The SEK Tranche Bonds are denominated in Swedish Kronor and the USD Tranche Bonds are denominated in USD and each Bond is constituted by these Terms and Conditions. The Issuer undertakes to make payments in relation to the Bonds and to comply with these Terms and Conditions.

(b) By subscribing for Bonds, each initial Bondholder agrees that the Bonds shall benefit from and be subject to the Finance Documents and by acquiring Bonds, each subsequent Bondholder confirms such agreement.

(c) The nominal amount of (i) each SEK Tranche Bond is SEK 1 and (ii) each USD Tranche Bond is USD 1 (the **"Initial Nominal Amount"**). Subject to Clause 8, the maximum total nominal amount of the Bonds is the SEK equivalent of 550,000,000 (whereof an amount of Bonds corresponding to USD 16,180,000 applying an exchange rate of 85 per cent. of the Nominal Amount will be exchanged for New Senior Secured Bonds).

(d) The minimum permissible investment in a Bond Issue is (i) in respect of each SEK Tranche Bond, SEK 1,250,000 and (ii) in respect of each USD Tranche Bond, the USD equivalent to euro 100,000.

(e) The ISIN of the SEK Tranche Bonds is NO0012829847. The ISIN of the USD Tranche Bonds is NO0012829854.

(f) The Issuer is not permitted to issue additional Subsequent Bonds on or after the Amendment Date other than as a result of a Bond Exchange.

(g) The Bonds constitute direct, unconditional, unsubordinated and secured obligations of the Issuer and shall at all times rank (i) senior to the Backstop Fee Notes, (ii) behind the Super Senior Debt and the New Senior Secured Bonds pursuant to the terms of the Intercreditor Agreement and (iii) at least *pari passu* with all direct, unconditional, unsubordinated and unsecured obligations of the Issuer, except those obligations which are mandatorily preferred by law.

(h) The Bonds are freely transferable but the Bondholders may be subject to purchase or transfer restrictions with regard to the Bonds, as applicable, under local laws to which a Bondholder may be subject. Neither the Issuer nor the Agent shall be responsible to ensure compliance with such laws and each Bondholder must ensure compliance with such restrictions at its own cost and expense.

(i) No action is being taken in any jurisdiction that would or is intended to permit a public offering of the Bonds or the possession, circulation or distribution of any document or other material relating to the Issuer or the Bonds in any jurisdiction other than Sweden, where action for that purpose is required. Each Bondholder must inform itself about, and observe, any applicable restrictions to the transfer of material relating to the Issuer or the Bonds.

## 3. Use of Proceeds

The Issuer has used, and shall continue to use the Net Proceeds for refinancing of existing debt, investments and acquisitions or general corporate purposes of the Group.

## 4. [Reserved]

## 5. Bonds in Book-Entry Form

(a) The Bonds will be registered for the Bondholders on their respective Securities Accounts and no physical bonds will be issued. Accordingly, the Bonds will be registered in dematerialised form in the CSD according to the relevant securities registration legislation and the requirements of the CSD. Registration requests relating to the Bonds shall be directed to the Paying Agent or an Account Operator.

(b) In order to carry out its functions and obligations under these Terms and Conditions, the Agent will have access to the relevant information regarding ownership of the Bonds, as recorded and regulated with the CSD (subject to applicable law).

(c) For the purpose of or in connection with any Bondholders' Meeting or any Written Procedure, the Agent shall be entitled to obtain information from the debt register kept by the CSD in respect of the Bonds (subject to applicable law).

(d) The Issuer shall issue any necessary power of attorney to such Persons employed by the Agent, as notified by the Agent, in order for such individuals to independently obtain information directly from the debt register kept by the CSD in respect of the Bonds (subject to applicable law). The Issuer may not revoke any such power of attorney unless directed by the Agent or unless consent thereto is given by the Bondholders.

## 6. Right to Act on Behalf of a Bondholder

(a) If a beneficial owner of a Bond not being registered as a Bondholder wishes to exercise any rights under the Finance Documents it must obtain proof of ownership of the Bonds, acceptable to the Agent.

(b) A Bondholder may issue one or several powers of attorney or other authorisation to third parties to represent it in relation to some or all of the Bonds held by it. Any such representative may act independently under the Finance Documents in relation to the Bonds for which such representative is entitled to represent the Bondholder and may further delegate its right to represent the Bondholder by way of a further power of attorney.

(c) A Bondholder (whether registered as such or proven to the Agent's satisfaction to be the beneficial owner of the Bond as set out in paragraph (a) above) may issue one or more powers of attorney to third parties to represent it in relation to some or all of the Bonds held or beneficially owned by such Bondholder. The Agent shall only have to examine the face of a power of attorney or other similar

evidence of authorisation that has been provided to it pursuant to this paragraph (c) and may assume that it is in full force and effect, unless otherwise is apparent from its face or the Agent has actual knowledge to the contrary.

## 7. Payments in Respect of the Bonds

(a) The Issuer will unconditionally make available to or to the order of the Agent and/or the Paying Agent all amounts due on each payment date pursuant to the terms of these Terms and Conditions at such times and to such accounts as specified by the Agent and/or the Paying Agent in advance of each payment date or when other payments are due and payable pursuant to these Terms and Conditions.

(b) All payments to the Bondholders in relation to the Bonds shall be made to each Bondholder registered as such in the CSD at the relevant Record Date, by, if no specific order is made by the Agent, crediting the relevant amount to the bank account nominated by such Bondholder in connection with its securities account in the CSD.

(c) Payment constituting good discharge of the Issuer's payment obligations to the Bondholders under these Terms and Conditions will be deemed to have been made to each Bondholder once the amount has been credited to the bank holding the bank account nominated by the Bondholder in connection with its securities account in the CSD. If the paying bank and the receiving bank are the same, payment shall be deemed to have been made once the amount has been credited to the bank account nominated by the Bondholder in question.

(d) If a payment date to the Bondholders pursuant to the Finance Documents falls on a day on which either of the relevant CSD settlement system or the relevant currency settlement system for the Bonds are not open, the payment shall be made on the first following possible day on which both of the said systems are open, unless any provision to the contrary have been set out for such payment in the relevant Finance Document.

(e) If, due to any obstacle for the CSD, the Issuer cannot make a payment or repayment, such payment or repayment may be postponed until the obstacle has been removed. Interest shall accrue without any default interest in accordance with Clause 8(i) during such postponement.

(f) If payment or repayment is made in accordance with this Clause 7, the Issuer and the CSD shall be deemed to have fulfilled their obligation to pay, irrespective of whether such payment was made to a Person not entitled to receive such amount (unless the Issuer has actual knowledge of the fact that the payment was made to the wrong person).

(g) The Issuer is not liable to gross-up any payments under the Finance Documents by virtue of any withholding tax, public levy or the similar.

(h)     Notwithstanding anything to the contrary in these Terms and Conditions, the Bonds shall be subject to, and any payments made in relation thereto shall be made in accordance with, the rules and procedures of the CSD.

(i)     Should the Paying Agent be prohibited from making a payment or repayment in USD on the applicable payment date as a consequence of such day not being a business day in the United States of America (as applicable), such payment or repayment shall instead be made on the first CSD Business Day following the payment which is a business day also in the United States of America.

## 8.     Interest

(a)     Each Bond carries Interest at the Interest Rate from (and including) the Interest Payment Date falling on 9 February 2024 up to (but excluding) the relevant Redemption Date.

(b)     Interest accrues during an Interest Period. Interest accrued but unpaid on the Bonds up until and including the Amendment Date in accordance with the Terms and Conditions in force prior to the Amendment Date shall not be payable by the Issuer.

(c)     Until the Agent has confirmed to the Issuer receipt of evidence (such evidence to be provided by the Issuer) that the total nominal amount outstanding under the New Senior Secured Bonds is 50 per cent. or less than the original total nominal amount of the New Senior Secured Bonds (such original total nominal amount being USD 26,180,000), Interest shall be capitalised at the Compound Interest Rate semi-annually in arrears on each Interest Payment Date for the preceding Interest Period.

(d)     Following confirmation from the Agent that the total nominal amount outstanding under the New Senior Secured Bonds is 50 per cent. or less than the original total nominal amount) pursuant to Clause 8(c), the Issuer may apply any Cash and Cash Equivalents of the Issuer at the date falling 10 Business Days prior to the Record Date for the relevant interest payment (excluding (i) any funds held on pledged/charged bank accounts and (ii) funds equivalent to the amount of the next interest payment to be made under the Super Senior RCF and the New Senior Secured Bonds) in excess of SEK 50,000,000 (or the equivalent in any other currency) towards payment of Interest in cash at the Cash Interest Rate on the relevant Interest Payment Date.

(e)     Any portion of the Interest not paid in cash pursuant Clause 8(d), shall instead be capitalised at the Compound Interest Rate on the relevant Interest Payment Date.

(f)     Any capitalised Interest in respect of the Bonds shall itself bear Interest at the Interest Rate.

(g)     Notwithstanding Clauses 8(c) and 8(d) above, following receipt by the Agent of evidence that the Super Senior RCF and the New Senior Secured Bonds have

been repaid and discharged in full, the Issuer shall pay interest in cash at the Cash Interest Rate on each subsequent Interest Payment Date.

(h) Interest shall be calculated on the basis of a 360-day year comprised of twelve (12) months of thirty (30) days each and, in case of an incomplete month, the actual number of days elapsed (30/360-days basis)

(i) If the Issuer fails to pay any amount payable by it on its due date under the Finance Documents ("**Overdue Amount**"), default interest shall accrue on the Overdue Amount from (and including) the due date up to (but excluding) the date of actual payment at a rate which is two per cent. higher than the Interest Rate. Default interest accrued on any Overdue Amount pursuant to this paragraph (d) will be added to the Overdue Amount on each Interest Payment Date until the Overdue Amount and default interest accrued thereon have been repaid in full. No default interest shall accrue where the failure to pay was solely attributable to the Agent, the Paying Agent or the CSD, in which case the Interest Rate shall apply instead. These Terms and Conditions apply with identical terms and conditions to (i) all Bonds issued under this ISIN and (ii) any Overdue Amounts issued under one or more separate ISIN in accordance with the regulations of the CSD from time to time. Holders of Overdue Amounts related to interest claims will not have any other rights under these Terms and Conditions than their claim for payment of such interest claim which claim shall be subject to paragraph (g) of Clause 16 (*Decisions by Bondholders*).

## 9. Redemption and Repurchase of the Bonds

### 9.1 Redemption at maturity

The Issuer shall redeem all, but not only some, of the outstanding Bonds in full on the Final Maturity Date with an amount per Bond equal to the Nominal Amount together with accrued but unpaid Interest. If the Final Maturity Date is not a CSD Business Day, then the redemption shall occur on the first following CSD Business Day.

### 9.2 Issuer's purchase of Bonds

The Issuer may, subject to applicable law, at any time and at any price purchase Bonds on the market or in any other way. Bonds held by the Issuer (including Bonds repurchased by the Issuer pursuant to Clause 9.4 (*Mandatory repurchase due to a Change of Control Event (put option)*) or Clause 9.5 (*Mandatory repurchase due to an Equity Listing Event (Reverse Equity Claw Back) (put option)*)) may at the Issuer's discretion be retained or sold but not cancelled (other than in connection with a redemption of the Bonds in full, a Bond Exchange or an issue of New Senior Secured Bonds).

### 9.3 Voluntary total redemption (call option)

(a) Subject to the terms of the Intercreditor Agreement and provided that the New Senior Secured Bonds having been redeemed in full, the Issuer may redeem all, but not only some, of the outstanding Bonds in full:

(i)      any time from and including the First Issue Date to, but excluding, the First Call Date at an amount per Bond equal to 105 per cent. of the Nominal Amount plus the remaining interest payments, calculated in accordance with Clause 9.3(b), up to and including the First Call Date together with accrued but unpaid Interest;

(ii)     any time from and including the First Call Date to, but excluding, the first CSD Business Day falling 18 months after the First Issue Date at an amount per Bond equal to 105 per cent. of the Nominal Amount, together with accrued but unpaid Interest;

(iii)    any time from and including the first CSD Business Day falling 24 months after the First Issue Date to, but excluding, the first Business Day falling 30 months after the First Issue Date at an amount per Bond equal to 104 per cent. of the Nominal Amount, together with accrued but unpaid Interest;

(iv)    any time from and including the first CSD Business Day falling 30 months after the First Issue Date to, but excluding, the first Business Day falling 36 months after the First Issue Date at an amount per Bond equal to 103 per cent. of the Nominal Amount, together with accrued but unpaid Interest;

(v)     any time from and including the first CSD Business Day falling 36 months after the First Issue Date to, but excluding, the first Business Day falling 42 months after the First Issue Date at an amount per Bond equal to 102 per cent. of the Nominal Amount, together with accrued but unpaid Interest; and

(vi)    any time from and including the first CSD Business Day falling 42 months after the First Issue Date to, but excluding, the Final Maturity Date at an amount per Bond equal to 101 per cent. of the Nominal Amount, together with accrued but unpaid Interest.

(b)     Redemption in accordance with Clause 9.3(a) shall be made by the Issuer on a CSD Business Day giving not less than 10 Business Days' notice to the Bondholders and the Agent. Upon receipt of such notice, the Agent shall inform the Paying Agent. The notice shall specify the Redemption Date and also the Record Date on which a person shall be registered as a Bondholder to receive the amounts due on such Redemption Date. Any such notice is irrevocable and unconditional, but may, at the Issuer's discretion, contain one or more conditions precedent. Upon expiry of such notice and the fulfilment of the conditions precedent (if any), the Issuer is bound to redeem the Bonds in full at the applicable amounts.

(c)     Unless the redemption price is set out in the written notice where the Issuer exercises its right to redemption, the Issuer shall publish the redemption price to the Bondholders as soon as possible and at the latest within three Business Days from the date of the notice.

(d)     For the purpose of calculating the remaining interest payments pursuant to Clause 9.3(a)(i) it shall be assumed that the Interest Rate for the period from the relevant Record Date to the First Call Date will be equal to the Interest Rate in effect on the date on which notice of redemption is given to the Bondholders. The relevant Record Date shall be agreed upon between the Issuer, the CSD, the Paying Agent and the Agent in connection with such repayment.

## 9.4     Mandatory repurchase due to a Change of Control Event (put option)

(a)     Subject to the terms of the Intercreditor Agreement, upon the occurrence of a Change of Control Event each Bondholder shall have the right to request that all, or some only, of its Bonds be repurchased at a price per Bond equal to 101 per cent. of the Nominal Amount together with accrued but unpaid Interest, during a period of 20 Business Days following a notice from the Issuer of the Change of Control Event pursuant to Clause 11.1(e) (after which time period such rights lapse). However, such period may not start earlier than upon the occurrence of the Change of Control Event.

(b)     The notice from the Issuer pursuant to Clause 11.1(e) shall specify the repurchase date and include instructions about the actions that a Bondholder needs to take if it wants Bonds held by it to be repurchased. If a Bondholder has so requested, and acted in accordance with the instructions in the notice from the Issuer, the Issuer shall repurchase the relevant Bonds and the repurchase amount shall fall due on the repurchase date specified in the notice given by the Issuer pursuant to Clause 11.1(e). The repurchase date must fall no later than 40 CSD Business Days after the end of the period referred to in Clause 9.4(a).

(c)     The Issuer shall comply with the requirements of any applicable securities laws or regulations in connection with the repurchase of Bonds. To the extent that the provisions of such laws and regulations conflict with the provisions in this Clause 9.4, the Issuer shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Clause 9.4 by virtue of the conflict.

## 9.5     Mandatory repurchase due to an Equity Listing Event (Reverse Equity Claw Back) (put option)

(a)     Subject to the terms of the Intercreditor Agreement, upon the occurrence of an Equity Listing Event each Bondholder shall, pursuant to a public tender offer, have the right to request that all, or some only, of its Bonds be repurchased at a price per Bond equal to 101 per cent. of the Nominal Amount together with accrued but unpaid Interest, during a period of 20 Business Days following a notice from the Issuer of the Equity Listing Event pursuant to Clause 11.1(e) (after which time period such rights lapse).

(b)     The amount to be applied by the Issuer towards prepayment pursuant to paragraph (a) above is equal to 50 per cent. of the net cash proceeds received by the Issuer as a result of such Equity Listing Event (net of fees, charges, transaction costs and commissions actually incurred in connection with such

Equity Listing Event and net of taxes paid or payable as a result of such Equity Listing Event) (the "**Equity Listing Proceeds**").

(c)     In case the aggregate Nominal Amount (plus premium and accrued but unpaid Interest) (the "**Bond Put Amount**") of the Bonds that are requested by Bondholders to be repurchased in accordance with paragraph (a) above exceeds the Equity Listing Proceeds, the Issuer shall repurchase Bonds held by Bondholders who has exercised the put option on a *pro rata* basis (always rounded down to multiples of the Bond Put Amount). The rights under this Clause 9.5 shall not limit the rights under Clause 9.4 (*Mandatory repurchase due to a Change of Control Event (put option)*) if a Change of Control Event has occurred.

(d)     A notice from the Issuer pursuant to Clause 11.1(e) shall specify the repurchase date and include instructions about the actions that a Bondholder needs to take if it wants Bonds held by it to be repurchased. If a Bondholder has so requested, and acted in accordance with the instructions in the notice from the Issuer, the Issuer shall repurchase the relevant Bonds and the repurchase amount shall fall due on the repurchase date specified in the notice given by the Issuer pursuant to Clause 11.1(d). The repurchase date must fall no later than 40 CSD Business Days after the end of the period referred to in Clause 9.5(a).

(e)     The Issuer shall comply with the requirements of any applicable securities laws or regulations in connection with the repurchase of Bonds. To the extent that the provisions of such laws and regulations conflict with the provisions in this Clause 9.5, the Issuer shall comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Clause 9.5 by virtue of the conflict.

### 9.6     Bond Exchange

(a)     A Bondholder holding USD Tranche Bonds may, at one or several occasions, request in writing that all, or only some, of its USD Tranche Bonds are exchanged to SEK Tranche Bonds (such bonds being the "**Exchange SEK Bonds**") applying the Exchange Rate (with a right to pay any excess in cash (adjusted to take into consideration any Interest to be paid on the subsequent Interest Payment Date on the Exchange SEK Bonds) to receive a whole number of SEK Tranche Bonds if the bondholder does not hold a sufficient number of USD Tranche Bonds) (the "**Bond Exchange**").

(b)     The Bond Exchange shall take place no later than five CSD Business Days (with an intention for it to take place within three CSD Business Days) after a request is received by a Bondholder and provided that such Bondholder prior to such date has delivered the USD Tranche Bonds being subject to the Bond Exchange to the Sole Bookrunner (or as otherwise directed by the Issuer and the Agent).

(c)     The Issuer shall promptly, following the completion of the Bond Exchange, cancel the USD Tranche Bonds being subject to the Bond Exchange.

(d)     Following a Bond Exchange, the Exchange SEK Bonds shall carry Interest at the Interest Rate for the present Interest Period as if had been a SEK Tranche Bond such entire Interest Period.

## 10.     Transaction Security and Guarantees

(a)     Subject to the Intercreditor Agreement, as continuing Security for the due and punctual fulfilment of the Secured Obligations, the Issuer, the Guarantors and each Group Company party to any Security Document and/or the Guarantee and Adherence Agreement grants the Transaction Security and the Guarantees (as applicable) to the Secured Parties as represented by the Security Agent on the terms set out in the Security Documents and the Guarantee and Adherence Agreement (as applicable).

(b)     The Security Agent shall hold the Transaction Security and the Guarantees on behalf of the Secured Parties in accordance with the Intercreditor Agreement, the Security Documents and the Guarantee and Adherence Agreement (as applicable). The Issuer shall, and shall procure that the Guarantors and each Group Company party to any Security Document and/or the Guarantee and Adherence Agreement (as applicable) will, enter into the Security Documents and/or the Guarantee and Adherence Agreement and perfect the Transaction Security in accordance with the Security Documents.

(c)     All Transaction Security and Guarantees shall be subject to, and limited as required by, financial assistance regulations, corporate benefit limitations and other corporate law limitations, and be granted pursuant to and in accordance with the Agreed Security Principles.

(d)     Unless and until the Security Agent has received instructions from the Bondholders in accordance with Clause 16 (*Decisions by Bondholders*), the Security Agent shall (without first having to obtain the Bondholders' consent) be entitled to enter into agreements with the Issuer or a third party or take any other actions, if it is, in the Security Agent's opinion, necessary for the purpose of maintaining, altering, releasing or enforcing the Transaction Security or the Guarantees, creating further Security or Guarantees for the benefit of the Secured Parties or for the purpose of settling the Bondholders' or the Issuer's rights to the Transaction Security or the Guarantees, in each case in accordance with the terms of the Finance Documents and provided that such agreements or actions are not detrimental to the interest of the Bondholders.

(e)     The Security Agent shall, on behalf of the Secured Parties, keep all certificates and other documents that are bearers of rights relating to the Transaction Security in safe custody.

(f)     The Security Agent shall be entitled to give instructions relating to the Transaction Security and the Guarantees to the Security Agent.

(g)     The Security Agent shall be authorised to release Transaction Security and/or the Guarantees granted by or over a Disposing Group Company following the

completion of a Transfer in accordance with the terms set out in paragraphs (b)(ii) and (b) (iii) of Clause 13.14 (*Business*).

## 11. Information to Bondholders

### 11.1 Information from the Issuer

(a) The Issuer shall make the following information available in the English language by publication on the website of the Issuer:

(i) as soon as the same become available, but in any event within four months after the end of each financial year, the annual audited consolidated financial statements of the Group, including a profit and loss account, a balance sheet, a cash flow statement and management commentary or report from the Issuer's board of directors;

(ii) as soon as the same become available, but in any event within two months after the end of each quarter of its financial year, the quarterly unaudited consolidated reports or the year-end report (Sw. *bokslutskommuniké*) (as applicable), including a profit and loss account, a balance sheet, a cash flow statement and management commentary or report from the Issuer's board of directors; and

(iii) any other information required by the Swedish Securities Markets Act (Sw. *lag (2007:528) om värdepappersmarknaden*) and the rules and regulations of the Regulated Market on which the Bonds are admitted to trading.

(b) When the Bonds have been listed on a Regulated Market:

(i) the information set out in Clause 11.1(a) shall also be made available by way of press release; and

(ii) the reports referred to in paragraph (a)(i) and (a)(ii) above shall be prepared in accordance with IFRS.

(c) When the financial statements and other information are made available to the Bondholders pursuant to paragraph (a) above, the Issuer shall send copies of such financial statements and other information to the Agent.

(d) The Issuer shall procure that the aggregate Nominal Amount held by Group Companies is clearly stated in each quarterly unaudited consolidated report published by the Issuer pursuant to paragraph (a)(ii) above.

(e) The Issuer shall promptly notify the Agent and the Bondholders upon becoming aware of the occurrence of a Change of Control Event or an Equity Listing Event and shall provide the Agent with such further information as the Agent may request (acting reasonably) following receipt of such notice. A notice regarding a Change of Control Event or an Equity Listing Event may be given in advance of the occurrence of a Change of Control Event or an Equity Listing Event,

conditioned upon the occurrence of such Change of Control Event or an Equity Listing Event, if a definitive agreement is in place providing for a Change of Control Event or an Equity Listing Event.

(f) The Issuer shall promptly notify the Agent (with full particulars) upon becoming aware of the occurrence of any event or circumstance which constitutes an Event of Default, or any event or circumstance which would (with the expiry of a grace period, the giving of notice, the making of any determination or any combination of any of the foregoing) constitute an Event of Default, and shall provide the Agent with such further information as it may reasonably request in writing following receipt of such notice. Should the Agent not receive such information, the Agent is entitled to assume that no such event or circumstance exists or can be expected to occur, provided that the Agent does not have actual knowledge of such event or circumstance.

(g) The Issuer shall submit a duly executed Compliance Certificate to the Agent:

(i) in connection with the testing of the Incurrence Test;

(ii) in connection with that a Financial Report is made available; and

(iii) at the Agent's request, within 20 Business Days from such request.

(h) The Agent may assume that any information provided by the Issuer in the Compliance Certificate delivered pursuant to paragraph (g) above is correct, and the Agent shall not be responsible or liable for the adequacy, accuracy or completeness of such information.

(i) The Issuer is only obliged to inform the Agent according to this Clause 11.1 if informing the Agent would not conflict with any applicable laws or, when the Bonds are listed, the Issuer's registration contract with the Regulated Market. If such a conflict would exist pursuant to the listing contract with the Regulated Market or otherwise, the Issuer shall however be obliged to either seek approval from the Regulated Market or undertake other reasonable measures, including entering into a non-disclosure agreement with the Agent, in order to be able to timely inform the Agent according to this Clause 11.1.

## 11.2 Information from the Agent

(a) Subject to applicable laws, regulations and the restrictions of a non-disclosure agreement entered into by the Agent in accordance with Clause 11.2(b), the Agent is entitled to disclose to the Bondholders any event or circumstance directly or indirectly relating to the Issuer or the Bonds. Notwithstanding the foregoing, the Agent may if it considers it to be beneficial to the interests of the Bondholders delay disclosure or refrain from disclosing certain information other than in respect of an Event of Default that has occurred and is continuing.

(b) If a committee representing the Bondholders' interests under the Finance Documents has been appointed by the Bondholders in accordance with Clause 16 (*Decisions by Bondholders*), the members of such committee may agree with the Issuer not to disclose information received from the Issuer,

provided that it, in the reasonable opinion of such members, is beneficial to the interests of the Bondholders. The Agent shall be a party to such agreement and receive the same information from the Issuer as the members of the committee.

### 11.3 Publication of Finance Documents

(a) The latest version of these Terms and Conditions (including any documents amending these Terms and Conditions) shall be available on the websites of the Issuer and the Agent.

(b) The latest version of these Terms and Conditions, the Security Documents, the Guarantee and Adherence Agreement and the Intercreditor Agreement shall be available to the Bondholders at the office of the Agent during the Agent's normal business hours.

## 12. Financial Undertakings

### 12.1 Incurrence Test

(a) The Incurrence Test is met if:

(i) the ratio of Net Interest Bearing Debt to EBITDA does not exceed 3.00:1; and

(ii) no Event of Default is continuing or would occur upon the making of the relevant payment under such any deferred payment obligations and/or earn-out obligations.

### 12.2 Testing of the Incurrence Test

The calculation of the ratio of Net Interest Bearing Debt to EBITDA shall be made as per a testing date determined by the Issuer, falling no more than three months prior to the making of the relevant payment. The Net Interest Bearing Debt shall be measured on the relevant testing date so determined, adjusted for any events affecting such ratio after such testing date and include the contemplated payment.

### 12.3 Calculation Adjustments

The figures for EBITDA for the Reference Period ending on the last day of the period covered by the most recent Financial Report shall be used for the Incurrence Test adjusted so that:

(a) entities or business acquired by the Group during the Reference Period, or after the end of the Reference Period but before the relevant testing date, shall be included, *pro forma*, for the entire Reference Period;

(b) entities or business disposed of by the Group during the Reference Period, or after the end of the Reference Period but before the relevant testing date, shall be excluded, *pro forma*, for the entire Reference Period; and

(c)     any entity or business to be acquired with the proceeds from new Financial Indebtedness shall be included, *pro forma*, for the entire Reference Period,

provided that in relation to any acquired or disposed business, such business' Incremental Target EBITDA for the Reference Period immediately prior to the relevant acquisition shall be included or excluded (as applicable), *pro forma*, for the entire Reference Period.

## 13.     General Undertakings

### 13.1   General

The Issuer undertakes to (and shall, where applicable, procure that each other Group Company will and shall procure that each Obligor (pursuant to the Guarantee and Adherence Agreement) undertakes to) comply with the undertakings set out in this Clause 13 for as long as any Bonds remain outstanding.

### 13.2   Restricted Payments

(a)     The Issuer shall not, and shall procure that none of its Subsidiaries will:

(i)     pay any dividend in respect of its shares (other than to the Issuer or a wholly-owned, direct or indirect, Subsidiary of the Issuer and, if made by a Subsidiary which is not directly or indirectly wholly-owned by the Issuer, is made on a *pro rata* basis, and other than any dividends required to be made pursuant to mandatory law);

(ii)    repurchase or redeem any of its own shares;

(iii)   redeem or reduce its share capital or other restricted or unrestricted equity with repayment to its shareholders;

(iv)    repay any Shareholder Debt or pay any interest thereon;

(v)     make any prepayments or repayments under any long term debt ranking junior or *pari passu* with the Bonds;

(vi)    grant any loans except (A) to the Issuer or a wholly-owned Subsidiary of the Issuer or (B) in the ordinary course of business; or

(vii)   make any other similar distribution or transfers of value to the direct or indirect shareholders of the Issuer, or any Affiliates of the Issuer (other than to the Issuer or a wholly-owned, direct or indirect, Subsidiary of the Issuer and, if made by a Subsidiary which is not directly or indirectly wholly-owned by the Issuer, is made on a *pro rata* basis),

(paragraphs (i)-(vii) above are together and individually referred to as a "**Restricted Payment**").

(b)     Notwithstanding the above, a Restricted Payment may be made by the Issuer to the Parent:

(i) as a one-time distribution in an amount of the USD equivalent of SEK 10,000,000 in connection with, and using proceeds from, the issue of the New Senior Secured Bonds; or

(ii) solely for the purpose of financing the payment of administrative fees or costs, taxes, legal and audit fees, banking fees or board or board observer renumeration, in each case provided that no payments are made to a direct or indirect shareholder of the Issuer, and provided that the aggregate amount of such payments does not exceed SEK 1,000,000 *per annum*.

## 13.3 Listing

(a) The Issuer shall ensure that:

(i) the Initial Bonds are listed on the corporate bond list of Nasdaq Stockholm or another Regulated Market within fifteen months after the First Issue Date;

(ii) any Subsequent Bonds issued in the form of SEK Tranche Bonds are listed on the relevant Regulated Market within 60 days after the issuance of such Subsequent Bonds (unless the Subsequent Bonds are issued before the Initial Bonds are listed on a Regulated Market in which case such Subsequent Bonds shall be listed within fifteen months after the First Issue Date); and

(iii) the SEK Tranche Bonds, once admitted to trading on a Regulated Market, continue to be listed thereon for as long as any Bond is outstanding (however, taking into account the rules and regulations of the relevant Regulated Market and the CSD (as amended from time to time) preventing trading in the SEK Tranche Bonds in close connection to the redemption of the SEK Tranche Bonds).

(b) The Issuer shall ensure that the Initial Bonds are admitted to trading on the Open Market of the Frankfurt Stock Exchange or another MTF within two months after the First Issue Date and remain admitted to trading on such exchange until the Initial Bonds have been admitted to trading on the corporate bond list of Nasdaq Stockholm or another Regulated Market.

## 13.4 Nature of Business

The Issuer shall procure that no substantial change is made to the general nature of the business carried on by the Group (taken as a whole) as of the First Issue Date if such substantial change would have a Material Adverse Effect.

## 13.5 Financial Indebtedness

The Issuer shall not, and shall procure that no other Group Company will, incur, prolong, maintain, renew or extend any Financial Indebtedness, other than Permitted Debt.

### 13.6 Disposal of Assets

(a)     The Issuer shall not, and shall procure that no other Group Company, sell or otherwise dispose of any shares in any Group Company or of all or substantially all of its or that Subsidiary's assets, or operations to any Person not being the Issuer or any of its wholly-owned Subsidiaries, unless the transaction (i) is carried out at fair market value and on arm's length terms and (ii) does not have a Material Adverse Effect.

(b)     No asset that is subject to Transaction Security may be disposed of other than in accordance with the terms of the Intercreditor Agreement.

### 13.7 Negative Pledge

The Issuer shall not, and shall procure that no other Group Company will, provide, prolong, renew or extend any Security over any of its/their assets (present or future), other than any Permitted Security.

### 13.8 Additional Security and Guarantees

(a)     Subject to the Intercreditor Agreement, the Issuer shall, in each case pursuant to and in accordance with the Agreed Security Principles, no later than 60 calendar days following the acquisition or incorporation of a Group Company procure that Security over the shares in each Group Company is granted to the Secured Parties (represented by the Agent) and in connection therewith provide to the Agent:

(i)      constitutional documents and corporate resolutions (approving the relevant Security Document and authorising a signatory/-ies to execute that Security Document) for the relevant security provider and each other party to that Security Document (other than the Agent);

(ii)     copies of the relevant Security Documents duly executed,

(iii)    evidence that the Transaction Security either has been or will be perfected in accordance with the terms of the relevant Security Documents;

(iv)     any legal opinion on the capacity and due execution in respect of any entity being party to the relevant Security Document unless it is incorporated in Sweden, issued by a reputable law firm;

(v)      any legal opinion on the validity and enforceability in respect of the relevant Security Document unless it is governed by Swedish law which, if requested by the Agent, shall also include customary opinions regarding the role of the Security Agent in such jurisdiction (such as no residency or registration requirement and no need to deposit funds), issued by a reputable law firm.

(b)     Subject to the Intercreditor Agreement, the Issuer shall, in each case in accordance with the Agreed Security Principles, no later than 60 calendar days

following the acquisition or incorporation of a Group Company, procure that each Group Company accedes to the Guarantee and Adherence Agreement and in connection therewith provides to the Agent:

(i) duly executed accession letters to the Guarantee and Adherence Agreement;

(ii) duly executed accession letters to the Intercreditor Agreement;

(iii) constitutional documents and corporate resolutions (approving the relevant Finance Documents and authorising a signatory/-ies to execute the Finance Documents) for it and each other party to a Finance Document (other than the Agent); and

(iv) any legal opinion on the capacity and due execution unless such Group Company is incorporated in Sweden, issued by a reputable law firm.

(c) The provisions in paragraphs (a) and (b) above does not apply to a Disposing Group Company provided that:

(i) the Transfer has been completed prior to the date when such Disposing Group Company would need to have acceded to the Guarantee and Adherence Agreement or the date when Transaction Security would need to have been granted over the shares in such Disposing Group Company (as applicable);

(ii) the relevant Disposing Group Company does not have any assets (other than as required by law); and

(iii) the relevant Disposing Group Company will be liquidated or otherwise disposed of as soon as practically possible following the completion of the Transfer

## 13.9 Additional Security Material Intercompany Loans

Subject to the Intercreditor Agreement, the Issuer shall procure that no later than:

(a) with respect to Material Intercompany Loans extended to a debtor incorporated in Sweden, on the date of the extension of a Material Intercompany Loan or the qualification of a loan as a Material Intercompany Loan; or

(b) with respect to Material Intercompany Loans extended to a debtor not incorporated in Sweden, within 90 days upon the extension of a Material Intercompany Loan or the qualification of a loan as a Material Intercompany Loan,

grant a pledge over that Material Intercompany Loan as Security for all amounts outstanding under the Finance Documents pursuant to and in accordance with the Agreed Security Principles and simultaneously therewith deliver to the Agent (unless previously provided):

(i)     constitutional documents and corporate resolutions (approving the relevant Security Documents and authorising a signatory/-ies to execute the relevant Security Document) for the relevant security provider, and each other party to that Security Document (other than the Agent);

(ii)    a legal opinion on the capacity and due execution, in respect of any entity being party to the relevant Security Document unless it is incorporated in Sweden, issued by a reputable law firm; and

(iii)   any legal opinion on the validity and enforceability in respect of the relevant Security Document unless it is governed by Swedish law which, if requested by the Agent, shall also include customary opinions regarding the role of the Security Agent in such jurisdiction (such as no residency or registration requirement and no need to deposit funds), issued by a reputable law firm.

## 13.10  Dealings with related parties

The Issuer shall, and shall procure that each other Group Company, conduct all dealings with any Person (other than Group Companies) at arm's length terms.

## 13.11  Loans out

The Issuer shall not, and shall procure that no other Group Company will, extend any loans in any form to any other party other than as set out under Clause 13.2 (*Restricted Payments*).

## 13.12  Compliance with laws and authorisations

The Issuer shall, and shall make sure that each other Group Company will, (i) comply with all laws and regulations applicable from time to time (including but not limited to the rules of any Regulated Market or MTF on which the Issuer's securities from time to time are listed or admitted to trading) and (ii), obtain, maintain, and comply with, the terms and conditions of any authorisation, approval, licence or other permit required for the business carried out by a Group Company, in each case, if failure to do so has or is reasonably likely to have a Material Adverse Effect.

## 13.13  Business

(a)     Subject to paragraph (b) below, the Issuer shall procure that each member of the Group is incorporated in the Nordics, Spain, Germany, the Benelux Union, the United States of America or the United Kingdom (an "**Approved Jurisdiction**").

(b)     Notwithstanding paragraph (a) above, in connection with an acquisition of an entity, business or asset by a member of the Group, a Group Company may be incorporated in another country than an Approved Jurisdiction provided that:

(i)     all businesses and/or all assets of such Group Company (the "**Disposing Group Company**") is transferred to a Group Company incorporated in

an Approved Jurisdiction (the "**Acquiring Group Company**") within six months from the date of the acquisition ("**Transfer**");

(ii)     in case the Disposing Group Company is a Guarantor and/or is subject to Transaction Security, the Acquiring Group Company shall, no later than simultaneously as the completion of the Transfer, accede as a Guarantor and/or be subject to Transaction Security (as applicable); and

(iii)    in case a Material Intercompany Loan has been granted to the Disposing Group Company on or prior to the Transfer, such Material Intercompany Loan shall be transferred to the Acquiring Group Company subject to the Transaction Security and the Issuer and the Acquiring Group Company shall take any action necessary to procure that the Transaction Security remains perfected.

(c)     The Security Agent shall be authorised to release Transaction Security and/or the Guarantees granted by or over a Disposing Group Company following the completion of a Transfer in accordance with the terms set out in paragraphs (ii) and (iii) above.

## 13.14   Repurchase of Backstop Fee Notes

The Issuer shall not, and shall procure that no other Group Company will, redeem any Backstop Fee Notes, purchase any Backstop Fee Notes on the market or in any other way (including by way of bondholders under the Backstop Fee Notes utilising any applicable put options) or otherwise make any payments under the Backstop Fee Notes, excluding scheduled interest payments in accordance with the terms and conditions of the Backstop Fee Notes applicable at the Issue Date, unless explicitly permitted under these Terms and Conditions.

## 13.15   Undertakings relating to the Agency Agreement

(a)     The Issuer shall, in accordance with the Agency Agreement:

(i)     pay fees to the Agent;

(ii)    indemnify the Agent for costs, losses and liabilities;

(iii)   furnish to the Agent all information requested by or otherwise required to be delivered to the Agent; and

(iv)    not act in a way which would give the Agent a legal or contractual right to terminate the Agency Agreement.

(b)     The Issuer and the Agent shall not agree to amend any provisions of the Agency Agreement without the prior consent of the Bondholders if the amendment would be detrimental to the interests of the Bondholders.

## 14. Events of Default and Acceleration of the Bonds

Each of the events or circumstances set out in this Clause 14 (other than Clause 14.11 (*Acceleration of the Bonds*)) is an Event of Default.

### 14.1 Non-Payment

The Issuer or a Guarantor fails to pay an amount on the date it is due in accordance with the Finance Documents unless:

(a)     its failure to pay is caused by administrative or technical error; and

(b)     payment is made within five Business Days (or the following CSD Business Day if the fifth Business Day is not a CSD Business Day) of the due date.

### 14.2 Other Obligations

A party (other than the Agent) fails to comply with the Finance Documents, in any other way than as set out in Clause 14.1 (*Non-Payment*), provided that no Event of Default will occur if the failure to comply is capable of being remedied and the Issuer or that party has remedied the failure within 15 Business Days of the earlier (i) the Issuer or that party becoming aware of the failure to comply and (ii) the Agent requesting the Issuer in writing to remedy such failure.

### 14.3 Cross payment default and Cross-acceleration

Any Financial Indebtedness of the Parent, the Issuer, any Guarantor or any other Group Company is:

(a)     not paid when due as extended by any originally applicable grace period (if there is one); or

(b)     declared to be due and payable prior to its specified maturity as a result of an event of default (however described),

provided that no Event of Default will occur under this Clause 14.3 if (i) the aggregate amount of Financial Indebtedness that has fallen due is less than SEK 5,000,000 or (ii) it is owed to a Group Company.

### 14.4 Ownership of the Issuer

Subject to any new shares generated from an exercise of the rights under the Convertible Instrument, the Parent ceases to be the sole shareholder of the Issuer.

### 14.5 Insolvency

(a)     The Parent, the Issuer, any Guarantor or any Material Group Company is unable or admits inability to pay its debts as they fall due or is declared to be unable to pay its debts under applicable law, suspends making payments on its debts generally or, by reason of actual or anticipated financial difficulties, commences

negotiations with its creditors (except for Bondholders) with a view to rescheduling its Financial Indebtedness.

(b)     A moratorium is declared in respect of the Financial Indebtedness of the Parent, the Issuer, any Guarantor or any Material Group Company.

## 14.6    Insolvency Proceedings

Any corporate action, legal proceedings or other procedures are taken (other than (i) proceedings or petitions which are being disputed in good faith and are discharged, stayed or dismissed within 60 days of commencement or, if earlier, the date on which it is advertised and (ii), in relation to Subsidiaries of the Issuer not being subject to Transaction Security, solvent liquidations) in relation to:

(a)     the suspension of payments, winding-up, dissolution, administration or reorganisation (Sw. *företagsrekonstruktion*) (by way of voluntary agreement, scheme of arrangement or otherwise) of the Parent, the Issuer, any Guarantor or any Material Group Company; and

(b)     the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of the Parent, the Issuer, any Guarantor or any Material Group Company or any of its assets or any analogous procedure or step is taken in any jurisdiction in respect of the Parent, the Issuer, any Guarantor or any Material Group Company.

## 14.7    Mergers and demergers

A decision is made that any Group Company shall be demerged or merged if such merger or demerger is likely to have a Material Adverse Effect, provided that a merger subject to existing security between Subsidiaries only or between the Issuer and a Subsidiary, where the Issuer is the surviving entity, shall not be an Event of Default and a merger involving the Issuer, where the Issuer is not the surviving entity, shall always be considered an Event of Default and provided that the Issuer may not be demerged.

## 14.8    Creditors' Process

Any expropriation, attachment, sequestration, distress or execution or any analogous process in any jurisdiction affects any asset or assets of any Group Company having an aggregate value of an amount equal to or exceeding SEK 5,000,000 and is not discharged within 60 days.

## 14.9    Impossibility or Illegality

It is or becomes impossible or unlawful for the Issuer, any Guarantor or any Material Group Company to fulfil or perform any of the provisions of the Finance Documents or if the obligations under the Finance Documents are not, or cease to be, legal, valid, binding and enforceable.

### 14.10 Continuation of the Business

The Issuer or any other Group Company ceases to carry on its business (other than (i) following a merger that is not prohibited under the Finance Documents, (ii) a solvent liquidation permitted pursuant to Clause 14.6 (*Insolvency Proceedings*) or (iii) a disposal permitted under the Finance Documents), if such discontinuation is likely to have a Material Adverse Effect.

### 14.11 Acceleration of the Bonds

(a) Subject to the Intercreditor Agreement, upon the occurrence of an Event of Default which is continuing, the Agent is entitled to, and shall following a demand in writing from a Bondholder (or Bondholders) representing at least 50 per cent. of the Adjusted Nominal Amount (such demand may only be validly made by a Person who is a Bondholder on the Business Day immediately following the day on which the demand is received by the Agent and shall, if made by several Bondholders, be made by them jointly) or following an instruction given pursuant to Clause 14.11(e), on behalf of the Bondholders (i) by notice to the Issuer, declare all, but not some only, of the outstanding Bonds due and payable together with any other amounts payable under the Finance Documents, immediately or at such later date as the Agent determines, and (ii) exercise any or all of its rights, remedies, powers and discretions under the Finance Documents.

(b) The Agent may not accelerate the Bonds in accordance with Clause 14.11(a) by reference to a specific Event of Default if it is no longer continuing or if it has been decided, on a Bondholders Meeting or by way of a Written Procedure, to waive such Event of Default (temporarily or permanently).

(c) The Agent shall notify the Bondholders of an Event of Default within five Business Days of the date on which the Agent received actual knowledge of that an Event of Default has occurred and is continuing. Notwithstanding the aforesaid, the Agent may postpone a notification of an Event of Default (other than in relation to payments) up until the time stipulated paragraph (d) of Clause 14.11 (*Acceleration of the Bonds*) below for as long as, in the reasonable opinion of the Agent such postponement is in the interests of the Bondholders as a group. The Agent shall always be entitled to take the time necessary to determine whether an event constitutes an Event of Default.

(d) The Agent shall, within 20 Business Days of the date on which the Agent received actual knowledge of that an Event of Default has occurred and is continuing, decide if the Bonds shall be so accelerated. If the Agent decides not to accelerate the Bonds, the Agent shall promptly seek instructions from the Bondholders in accordance with Clause 16 (*Decisions by Bondholders*). The Agent shall always be entitled to take the time necessary to consider whether an occurred event constitutes an Event of Default.

(e) If the Bondholders (in accordance with these Terms and Conditions) instruct the Agent to accelerate the Bonds, the Agent shall promptly declare the Bonds due and payable and take such actions as may, in the opinion of the Agent, be

necessary or desirable to enforce the rights of the Bondholders under the Finance Documents, unless the relevant Event of Default is no longer continuing.

(f) If the right to accelerate the Bonds is based upon a decision of a court of law or a government authority, it is not necessary that the decision has become enforceable under law or that the period of appeal has expired in order for cause of acceleration to be deemed to exist.

(g) In the event of an acceleration of the Bonds in accordance with this Clause 14.11, the Issuer shall redeem all Bonds at an amount per Bond equal to the sum of (i) the Call Option Amount for the relevant period and, shall for the non-call period (until the date falling 9 months after the First Issue Date) be the Call Option Amount set out in Clause 9.3(a)(ii) and (ii) accrued and unpaid Interest.

## 15. Distribution of Proceeds

(a) All payments by the Issuer relating to the Bonds and the Finance Documents following a termination of the Bonds in accordance with Clause 14 (*Events of Default and Acceleration of the Bonds*) and any proceeds received from an enforcement of the Transaction Security or the Guarantees shall be made and/or distributed in accordance with the Intercreditor Agreement.

(b) If a Bondholder or another party has paid any fees, costs, expenses or indemnities referred to in Clause 15(a), such Bondholder or other party shall be entitled to reimbursement by way of a corresponding distribution in accordance with Clause 15(a).

(c) Funds that the Agent receives (directly or indirectly) in connection with the acceleration of the Bonds or the enforcement of the Transaction Security or the Guarantees constitute escrow funds (Sw. *redovisningsmedel*) and must be held on a separate interest-bearing account on behalf of the Bondholders and the other interested parties. The Agent shall arrange for payments of such funds in accordance with this Clause 15 as soon as reasonably practicable.

(d) If the Issuer or the Agent shall make any payment under this Clause 15, the Issuer or the Agent, as applicable, shall notify the Bondholders of any such payment at least 15 Business Days before the payment is made. Such notice shall specify the Record Date, the payment date and the amount to be paid. Notwithstanding the foregoing, for any Interest due but unpaid the Record Date specified in Clause 7(a) shall apply and for any partial redemption in accordance with Clause 9.4 (*Mandatory repurchase due to a Change of Control Event (put option)*) and/or Clause 9.5 (*Mandatory repurchase due to an Equity Listing Event (Reverse Equity Claw Back) (put option)*) due but not made, the Record Date specified in Clause 9.4 and/or Clause 9.5 (as applicable).

## 16. Decisions by Bondholders

(a)     A request by the Agent for a decision by the Bondholders on a matter relating to the Finance Documents shall (at the option of the Agent) be dealt with at a Bondholders' Meeting or by way of a Written Procedure.

(b)     Any request from the Issuer or a Bondholder (or Bondholders) representing at least 10 per cent. of the Adjusted Nominal Amount (such request may only be validly made by a Person who is a Bondholder on the Business Day immediately following the day on which the request is received by the Agent and shall, if made by several Bondholders, be made by them jointly) for a decision by the Bondholders on a matter relating to the Finance Documents shall be directed to the Agent and dealt with at a Bondholders' Meeting or by way a Written Procedure, as determined by the Agent. The Person requesting the decision may suggest the form for decision making, but if it is in the Agent's opinion more appropriate that a matter is dealt with at a Bondholders' Meeting than by way of a Written Procedure, it shall be dealt with at a Bondholders' Meeting.

(c)     The Agent may refrain from convening a Bondholders' Meeting or instigating a Written Procedure if (i) the suggested decision must be approved by any Person in addition to the Bondholders and such Person has informed the Agent that an approval will not be given, or (ii) the suggested decision is not in accordance with applicable regulations.

(d)     Only a Person who is, or who has been provided with a power of attorney or other authorisation pursuant to Clause 6 (*Right to Act on Behalf of a Bondholder*) from a Person who is, registered as a Bondholder:

(i)     on the Record Date prior to the date of the Bondholders' Meeting, in respect of a Bondholders' Meeting, or

(ii)    on the Record Date specified in the communication pursuant to Clause 18(c), in respect of a Written Procedure,

may exercise voting rights as a Bondholder at such Bondholders' Meeting or in such Written Procedure, provided that the relevant Bonds are included in the definition of Adjusted Nominal Amount.

(e)     The following matters shall require the consent of Bondholders representing at least 66 2/3 per cent. of the Adjusted Nominal Amount for which Bondholders are voting at a Bondholders' Meeting or for which Bondholders reply in a Written Procedure in accordance with the instructions given pursuant to Clause 18(c):

(i)     a change to the terms of any of Clause 2(a), and Clauses 2(f) to 2(i);

(ii)    a reduction of the premium payable upon the redemption or repurchase of any Bond pursuant to Clause 9 (*Redemption and Repurchase of the Bonds*);

(iii) a change to the Interest Rate or the Nominal Amount;

(iv) waive a breach of or amend an undertaking set out in Clause 13 (*General Undertakings*);

(v) a change to the terms for the distribution of proceeds set out in Clause 15 (*Distribution of Proceeds*);

(vi) a change to the terms dealing with the requirements for Bondholders' consent set out in this Clause 16;

(vii) a change of issuer, an extension of the tenor of the Bonds or any delay of the due date for payment of any principal or interest on the Bonds;

(viii) subject to paragraph (g) below, a release of the Transaction Security or the Guarantees, except in accordance with the terms of the Intercreditor Agreement, the Security Documents and/or the Guarantee and Adherence Agreement (as applicable);

(ix) a mandatory exchange of the Bonds for other securities; and

(x) early redemption of the Bonds, other than upon an acceleration of the Bonds pursuant to Clause 14 (*Events of Default and Acceleration of the Bonds*) or as otherwise permitted or required by these Terms and Conditions.

(f) Any matter not covered by Clause 16(e) shall require the consent of Bondholders representing more than 50 per cent. of the Adjusted Nominal Amount for which Bondholders are voting at a Bondholders' Meeting or for which Bondholders reply in a Written Procedure in accordance with the instructions given pursuant to Clause 18(c). This includes, but is not limited to, any amendment to, or waiver of, the terms of any Finance Document that does not require a higher majority (other than an amendment permitted pursuant to Clause 19(a)(i) or 19(a)(ii)), an acceleration of the Bonds, the enforcement of any Transaction Security or any Guarantees.

(g) Notwithstanding any other provisions in these Terms and Conditions or any other Finance Document, provided that the disposal requiring the release of Transaction Security or Guarantees is otherwise permitted under the Finance Documents each Bondholder irrevocably authorises and instructs the Security Agent to release such Transaction Security and/or Guarantees (as applicable) without notification, consultation, instruction or further consent, sanction or authority from the Bondholders and to consent to, execute, deliver and/or enter into any agreement necessary or desirable in order to give effect to release of such Transaction Security or Guarantees, as requested by the Issuer.

(h) Quorum at a Bondholders' Meeting or in respect of a Written Procedure only exists if a Bondholder (or Bondholders) representing at least 20 per cent. of the Adjusted Nominal Amount:

(i)    if at a Bondholders' Meeting, attend the meeting in person or by telephone conference (or appear through duly authorised representatives); or

(ii)    if in respect of a Written Procedure, reply to the request.

If a quorum exists for some, but not all, of the matters to be dealt with at a Bondholders' Meeting or by a Written Procedure, decisions may be taken in the matters for which a quorum exists.

(i)    If a quorum does not exist at a Bondholders' Meeting or in respect of a Written Procedure, the Agent or the Issuer shall convene a second Bondholders' Meeting (in accordance with Clause 17(a)) or initiate a second Written Procedure (in accordance with Clause 18(a)), as the case may be, provided that the relevant proposal has not been withdrawn by the Person(s) who initiated the procedure for Bondholders' consent. The quorum requirement in Clause 16(g) shall not apply to such second Bondholders' Meeting or Written Procedure.

(j)    Any decision which extends or increases the obligations of the Issuer or the Agent, or limits, reduces or extinguishes the rights or benefits of the Issuer or the Agent, under the Finance Documents shall be subject to the Issuer's or the Agent's consent, as appropriate.

(k)    A Bondholder holding more than one Bond need not use all its votes or cast all the votes to which it is entitled in the same way and may in its discretion use or cast some of its votes only.

(l)    The Issuer may not, directly or indirectly, pay or cause to be paid any consideration to or for the benefit of any Bondholder for or as inducement to any consent under these Terms and Conditions, unless such consideration is offered to all Bondholders that consent at the relevant Bondholders' Meeting or in a Written Procedure within the time period stipulated for the consideration to be payable or the time period for replies in the Written Procedure, as the case may be.

(m)    A matter decided at a duly convened and held Bondholders' Meeting or by way of Written Procedure is binding on all Bondholders, irrespective of them being present or represented at the Bondholders' Meeting or responding in the Written Procedure. The Bondholders that have not adopted or voted for a decision shall not be liable for any damages that this may cause other Bondholders.

(n)    All costs and expenses incurred by the Issuer or the Agent for the purpose of convening a Bondholders' Meeting or for the purpose of carrying out a Written Procedure, including reasonable fees to the Agent, shall be paid by the Issuer.

(o)    If a decision shall be taken by the Bondholders on a matter relating to the Finance Documents, the Issuer shall promptly at the request of the Agent provide the Agent with a certificate specifying the number of Bonds owned by

Group Companies or (to the knowledge of the Issuer) Affiliates, irrespective of whether such Person is directly registered as owner of such Bonds. The Agent shall not be responsible for the accuracy of such certificate or otherwise be responsible to determine whether a Bond is owned by a Group Company or an Affiliate.

(p)    Information about decisions taken at a Bondholders' Meeting or by way of a Written Procedure shall promptly be published on the websites of the Issuer and the Agent, provided that a failure to do so shall not invalidate any decision made or voting result achieved. The minutes from the relevant Bondholders' Meeting or Written Procedure shall at the request of a Bondholder be sent to it by the Issuer or the Agent, as applicable.

## 17. Bondholders' Meeting

(a)    The Agent shall convene a Bondholders' Meeting by sending a notice thereof to each Bondholder no later than five Business Days after receipt of a request from the Issuer or the Bondholder(s) (or such later date as may be necessary for technical or administrative reasons).

(b)    Should the Issuer want to replace the Agent, it may convene a Bondholders' Meeting in accordance with Clause 17(a) with a copy to the Agent. After a request from the Bondholders pursuant to Clause 21.4(c), the Issuer shall no later than five Business Days after receipt of such request (or such later date as may be necessary for technical or administrative reasons) convene a Bondholders' Meeting in accordance with Clause 17(a).

(c)    The notice pursuant to Clause 17(a) shall include (i) time for the meeting, (ii) place for the meeting, (iii) agenda for the meeting (including each request for a decision by the Bondholders), (iv) a form of power of attorney, (v) any applicable conditions precedent and conditions subsequent, (vi) the reasons for, and contents of, each proposal, (vii) if the proposal concerns an amendment to any Finance Document, the details of such proposed amendment, (viii) if a notification by the Bondholders is required in order to attend the Bondholders' Meeting, information regarding such requirement and (ix) information on where additional information (if any) will be published. Only matters that have been included in the notice may be resolved upon at the Bondholders' Meeting. Should prior notification by the Bondholders be required in order to attend the Bondholders' Meeting, such requirement shall be included in the notice.

(d)    The Bondholders' Meeting shall be held no earlier than 15 Business Days and no later than 30 Business Days from the notice.

(e)    Without amending or varying these Terms and Conditions, the Agent may prescribe such further regulations regarding the convening and holding of a Bondholders' Meeting as the Agent may deem appropriate. Such regulations may include a possibility for Bondholders to vote without attending the meeting in person.

## 18. Written Procedure

(a) The Agent shall instigate a Written Procedure (which may be conducted electronically) no later than five Business Days after receipt of a request from the Issuer or the Bondholder(s) (or such later date as may be necessary for technical or administrative reasons) by sending a communication to each Bondholder through the CSD.

(b) Should the Issuer want to replace the Agent, it may send a communication in accordance with Clause 18(a) to each Bondholder with a copy to the Agent.

(c) A communication pursuant to Clause 18(a) shall include (i) each request for a decision by the Bondholders, (ii) a description of the reasons for each request, (iii) a specification of the Business Day on which a Person must be a Bondholder (whether registered or a beneficial owner with proof of ownership in accordance with Clause 6 (*Right to Act on Behalf of a Bondholder*)) in order to be entitled to exercise voting rights, (iv) instructions and directions on where to receive a form for replying to the request (such form to include an option to vote yes or no for each request) as well as a form of power of attorney, (v) any applicable conditions precedent and conditions subsequent, (vi) if a proposal concerns an amendment to any Finance Document, the details of such proposed amendment, (vii) if the voting is to be made electronically, the instructions for such voting, (viii) information on where additional information (if any) will be published and (ix) the stipulated time period within which the Bondholder must reply to the request (such time period to last at least 15 Business Days from the communication pursuant to Clause 18(a)). If the voting shall be made electronically, instructions for such voting shall be included in the communication.

(d) When the requisite majority consents of the total Adjusted Nominal Amount pursuant to Clauses 16(e) and 16(f) have been received in a Written Procedure, the relevant decision shall be deemed to be adopted pursuant to Clause 16(e) or 16(f), as the case may be, even if the time period for replies in the Written Procedure has not yet expired.

(e) The Agent may, during the Written Procedure, provide information to the Issuer by way of updates whether or not quorum requirements have been met and about the eligible votes received by the Agent, including the portion consenting or not consenting to the proposal(s) or refraining from voting (as applicable).

## 19. Amendments and Waivers

(a) The Issuer and the Agent and/or the Security Agent (as applicable) (in each case acting on behalf of the Bondholders) may agree to amend the Finance Documents or waive any provision in a Finance Document, provided that:

(i) such amendment or waiver is not detrimental to the interest of the Bondholders as a group, or is made solely for the purpose of rectifying obvious errors and mistakes;

(ii)　　such amendment or waiver is required by applicable law, a court ruling or a decision by a relevant authority; or

(iii)　　such amendment or waiver has been duly approved by the Bondholders in accordance with Clause 16 (*Decisions by Bondholders*).

(b)　　The consent of the Bondholders is not necessary to approve the particular form of any amendment to the Finance Documents. It is sufficient if such consent approves the substance of the amendment or waiver.

(c)　　The Agent shall promptly notify the Bondholders of any amendments or waivers made in accordance with Clause 19(a), setting out the date from which the amendment or waiver will be effective, and ensure that any amendments to the Finance Documents are published in the manner stipulated in Clause 11.3 (*Publication of Finance Documents*). The Issuer shall ensure that any amendments to the Finance Documents are duly registered with the CSD and each other relevant organisation or authority, to the extent such registration is possible with the rules of the relevant CSD.

(d)　　An amendment to the Finance Documents shall take effect on the date determined by the Bondholders Meeting, in the Written Procedure or by the Agent, as the case may be.

## 20.　[Reserved]

## 21.　Appointment and Replacement of the Agent and the Security Agent

### 21.1　Appointment of Agent and the Security Agent

(a)　　By subscribing for Bonds, each initial Bondholder appoints the Agent and the Security Agent to act as its agent and security agent (as applicable) in all matters relating to the Bonds and the Finance Documents, and authorises each of the Agent and the Security Agent to act on its behalf (without first having to obtain its consent, unless such consent is specifically required by these Terms and Conditions) in any legal or arbitration proceedings relating to the Bonds held by such Bondholder including any legal or arbitration proceeding relating to the perfection, preservation, protection or enforcement of the Transaction Security and the Guarantees.

(b)　　By acquiring Bonds, each subsequent Bondholder confirms the appointment and authorisation for the Agent and the Security Agent to act on its behalf, as set forth in paragraph (a) above.

(c)　　Each Bondholder shall immediately upon request provide the Agent and the Security Agent with any such documents, including a written power of attorney (in form and substance satisfactory to the Agent or the Security Agent, as applicable), that the Agent or the Security Agent (as applicable) deems necessary for the purpose of exercising its rights and/or carrying out its duties under the Finance Documents. Neither the Agent nor the Security Agent is under

any obligation to represent a Bondholder which does not comply with such request.

(d) The Issuer shall promptly upon request provide the Agent and the Security Agent with any documents and other assistance (in form and substance satisfactory to the Agent or the Security Agent, as applicable), that the Agent or the Security Agent (as applicable) deems necessary for the purpose of exercising its rights and/or carrying out its duties under the Finance Documents.

(e) Each of the Agent and the Security Agent is entitled to fees for its respective work and to be indemnified for costs, losses and liabilities on the terms set out in the Finance Documents and the Agent's and the Security Agent's respective obligations as Agent and Security Agent (as applicable) under the Finance Documents are conditioned upon the due payment of such fees and indemnifications.

(f) Each of the Agent and the Security Agent may act as agent or trustee for several issues of securities or other loans issued by or relating to the Issuer and other Group Companies notwithstanding potential conflicts of interest.

## 21.2 Duties of the Agent and the Security Agent

(a) Each of the Agent and the Security Agent shall represent the Bondholders subject to and in accordance with the Finance Documents, including, *inter alia*, holding the Transaction Security pursuant to the Security Documents and the Guarantees pursuant to the Guarantee and Adherence Agreement on behalf of the Bondholders and, where relevant, enforcing the Transaction Security on behalf of the Bondholders. Neither the Agent nor the Security Agent is responsible for the content, valid execution, legal validity or enforceability of the Finance Documents or the perfection of the Transaction Security.

(b) When acting in accordance with the Finance Documents, each of the Agent and the Security Agent is always acting with binding effect on behalf of the Bondholders. Each of the Agent and the Security Agent shall carry out its duties under the Finance Documents in a reasonable, proficient and professional manner, with reasonable care and skill.

(c) Each of the Agent and the Security Agent's duties under the Finance Documents are solely mechanical and administrative in nature and the Agent and the Security Agent only acts in accordance with the Finance Documents and upon instructions from the Bondholders, unless otherwise set out in the Finance Documents. In particular, neither the Agent nor the Security Agent is acting as an advisor (whether legal, financial or otherwise) to the Bondholders or any other Person.

(d) Neither the Agent nor the Security Agent is obligated to assess or monitor the financial condition of the Issuer or compliance by the Issuer of the terms of the Finance Documents unless to the extent expressly set out in the Finance Documents, or to take any steps to ascertain whether any Event of Default (or any event that may lead to an Event of Default) has occurred. Until it has actual

knowledge to the contrary, each of the Agent and the Security Agent is entitled to assume that no Event of Default (or any event that may lead to an Event of Default) has occurred.

(e) Each of the Agent and the Security Agent is entitled to delegate its duties to other professional parties, but each of them shall remain liable for the actions of such parties under the Finance Documents.

(f) Each of the Agent and the Security Agent shall treat all Bondholders equally and, when acting pursuant to the Finance Documents, act with regard only to the interests of the Bondholders and shall not be required to have regard to the interests or to act upon or comply with any direction or request of any other Person, other than as explicitly stated in the Finance Documents.

(g) Each of the Agent and the Security Agent is entitled to engage external experts when carrying out its duties under the Finance Documents. The Issuer shall on demand by the Agent and/or the Security Agent pay all costs for external experts engaged after the occurrence of an Event of Default, or for the purpose of investigating or considering (i) an event which the Agent reasonably believes is or may lead to an Event of Default, (ii) a matter relating to the Issuer or the Transaction Security which the Agent and/or the Security Agent reasonably believes may be detrimental to the interests of the Bondholders under the Finance Documents or (iii) as otherwise agreed between the Agent and/or the Security Agent and the Issuer. Any compensation for damages or other recoveries received by the Agent and/or the Security Agent from external experts engaged by it for the purpose of carrying out its duties under the Finance Documents shall be distributed in accordance with Clause 15 (*Distribution of Proceeds*).

(h) Notwithstanding any other provision of the Finance Documents to the contrary, neither the Agent nor the Security Agent is obliged to do or omit to do anything if it would or might in its reasonable opinion constitute a breach of any law or regulation.

(i) If in the Agent's or Security Agent's (as applicable) reasonable opinion the cost, loss or liability which it may incur (including its respective reasonable fees) in complying with instructions of the Bondholders, or taking any action at its own initiative, will not be covered by the Issuer, or the Bondholders (as applicable), the Agent or the Security Agent (as applicable) may refrain from acting in accordance with such instructions, or taking such action, until it has received such funding or indemnities (or adequate Security has been provided therefore) as it may reasonably require.

(j) Unless it has actual knowledge to the contrary, each of the Agent and the Security Agent may assume that all information provided by or on behalf of the Issuer (including by its advisors) is correct, true and complete in all aspects.

(k) The Agent may instruct the CSD to split the Bonds to a lower nominal value in order to facilitate partial redemptions, write-downs or restructurings of the

(l)     Bonds or in other situations where such split is deemed necessary.

(m)     Each of the Agent and the Security Agent shall give a notice to the Bondholders (i) before it ceases to perform its obligations under the Finance Documents by reason of the non-payment by the Issuer of any fee or indemnity due to the Agent or the Security Agent under the Finance Documents or (ii) if it refrains from acting for any reason described in Clause 21.2(i).

## 21.3    Limited liability for the Agent and the Security Agent

(a)     Neither the Agent nor the Security Agent will be liable to the Bondholders for damage or loss caused by any action taken or omitted by it under or in connection with any Finance Document, unless directly caused by its negligence or wilful misconduct. Neither the Agent nor the Security Agent shall be responsible for indirect loss.

(b)     Neither the Agent nor the Security Agent shall be considered to have acted negligently if it has acted in accordance with advice addressed to it from or opinions of reputable external experts or if it has acted with reasonable care in a situation when it considers that it is detrimental to the interests of the Bondholders to delay the action in order to first obtain instructions from the Bondholders.

(c)     Neither the Agent nor the Security Agent shall be liable for any delay (or any related consequences) in crediting an account with an amount required pursuant to the Finance Documents to be paid by it to the Bondholders, provided that it has taken all necessary steps as soon as reasonably practicable to comply with the regulations or operating procedures of any recognised clearing or settlement system used by it for that purpose.

(d)     Neither the Agent nor the Security Agent shall have any liability to the Bondholders for damage caused by it acting in accordance with instructions of the Bondholders given in accordance with the Finance Documents.

(e)     Any liability towards the Issuer which is incurred by the Agent or the Security Agent in acting under, or in relation to, the Finance Documents shall not be subject to set-off against the obligations of the Issuer to the Bondholders under the Finance Documents.

(f)     The Agent is not liable for information provided to the Bondholders by or on behalf of the Issuer or any other Person.

## 21.4    Replacement of the Agent and the Security Agent

(a)     Subject to Clause 21.4(f), each of the Agent and the Security Agent may resign by giving notice to the Issuer and the Bondholders, in which case the Bondholders shall appoint a successor Agent and/or the Security Agent at a Bondholders' Meeting convened by the retiring Agent or by way of Written Procedure initiated by the retiring Agent.

(b)     Subject to Clause 21.4(f), if the Agent and/or the Security Agent is Insolvent, the Agent and/or the Security Agent (as applicable) shall be deemed to resign as Agent and/or the Security Agent (as applicable) and the Issuer shall within ten Business Days appoint a successor Agent and/or a successor Security Agent (as applicable) which shall be an independent financial institution or other reputable company which regularly acts as agent under debt issuances.

(c)     A Bondholder (or Bondholders) representing at least 10 per cent. of the Adjusted Nominal Amount may, by notice to the Issuer (such notice may only be validly given by a Person who is a Bondholder on the Business Day immediately following the day on which the notice is received by the Issuer and shall, if given by several Bondholders, be given by them jointly), require that a Bondholders' Meeting is held for the purpose of dismissing the Agent and/or the Security Agent and appointing a new Agent and/or the new Security Agent (as applicable). The Issuer may, at a Bondholders' Meeting convened by it or by way of Written Procedure initiated by it, propose to the Bondholders that the Agent and/or the Security Agent be dismissed and a new Agent and/or a new Security Agent (as applicable) be appointed.

(d)     If the Bondholders have not appointed a successor Agent and/or successor Security Agent within 90 days after (i) the earlier of the notice of resignation was given or the resignation otherwise took place or (ii) the Agent and/or the Security Agent was dismissed through a decision by the Bondholders, the Issuer shall appoint a successor Agent and/or successor Security Agent (as applicable) which shall be an independent financial institution or other reputable company which regularly acts as agent under debt issuances.

(e)     The retiring Agent and/or the retiring Security Agent (as applicable) shall, at its own cost, make available to the successor Agent and/or the successor Security Agent (as applicable) such documents and records and provide such assistance as the successor Agent and/or successor Security Agent may reasonably request for the purposes of performing its functions as Agent and/or the Security Agent (as applicable) under the Finance Documents.

(f)     The Agent's and the Security Agent's resignation or dismissal shall only take effect upon the appointment of a successor Agent and/or the successor Security Agent (as applicable) and acceptance by such successor Agent and/or the successor Security Agent (as applicable) of such appointment and the execution of all necessary documentation to effectively substitute the retiring Agent and/or the retiring Security Agent (as applicable).

(g)     Upon the appointment of a successor, the retiring Agent and/or the retiring Security Agent shall be discharged from any further obligation in respect of the Finance Documents but shall remain entitled to the benefit of the Finance Documents and remain liable under the Finance Documents in respect of any action which it took or failed to take whilst acting as Agent and/or the Security Agent (as applicable). Its successor, the Issuer and each of the Bondholders shall have the same rights and obligations amongst themselves under the Finance Documents as they would have had if such successor had been the original Agent and/or the Security Agent.

(h)     In the event that there is a change of the Agent and/or the Security Agent in accordance with this Clause 21.4, the Issuer shall execute such documents and take such actions as the new Agent and/or the new Security Agent may reasonably require for the purpose of vesting in such new Agent and/or the new Security Agent (as applicable) the rights, powers and obligation of the Agent and/or the Security Agent and releasing the retiring Agent and/or the retiring Security Agent (as applicable) from its respective further obligations under the Finance Documents. Unless the Issuer and the new Agent and/or the new Security Agent agrees otherwise, the new Agent and/or the new Security Agent shall be entitled to the same fees and the same indemnities as the retiring Agent and/or the retiring Security Agent (as applicable).

## 22.    Appointment and Replacement of the CSD

(a)     The Issuer has appointed the CSD to manage certain tasks under these Terms and Conditions and in accordance with the CSD regulations and the other regulations applicable to the Bonds.

(b)     The CSD may be dismissed by the Issuer provided that the Issuer has effectively appointed a replacement CSD that accedes as CSD at the same time as the old CSD is dismissed and provided also that the replacement does not have a negative effect on any Bondholder. The replacing CSD must be authorized to professionally conduct clearing operations pursuant to the Central Securities Depository Regulation (Regulation (EU) No. 909/2014) and be authorized as a central securities depository in accordance with any applicable securities legislation.

## 23.    Appointment and Replacement of the Paying Agent

(a)     The Issuer appoints the Paying Agent to manage certain specified tasks under these Terms and Conditions and in accordance with the legislation, rules and regulations applicable to and/or issued by the CSD and relating to the Bonds.

(b)     The Paying Agent may retire from its assignment or be dismissed by the Issuer, provided that the Issuer has approved that a commercial bank or securities institution approved by the CSD accedes as new Paying Agent at the same time as the old Paying Agent retires or is dismissed. If the Paying Agent is Insolvent, the Issuer shall immediately appoint a new Paying Agent, which shall replace the old Paying Agent as paying agent in accordance with these Terms and Conditions.

## 24.    No Direct Actions by Bondholders

(a)     A Bondholder may not take any steps whatsoever against the Issuer or with respect to the Transaction Security or the Guarantees to enforce or recover any amount due or owing to it pursuant to the Finance Documents, or to initiate, support or procure the winding-up, dissolution, liquidation, company reorganisation (Sw. *företagsrekonstruktion*) or bankruptcy (Sw. *konkurs*) (or its equivalent in any other jurisdiction) of the Issuer in relation to any of the liabilities of the Issuer under the Finance Documents.

(b)     Clause 24(a) shall not apply if the Agent has been instructed by the Bondholders in accordance with the Finance Documents to take certain actions but fails for any reason to take, or is unable to take (for any reason other than a failure by a Bondholder to provide documents in accordance with Clause 21.1(c)), such actions within a reasonable period of time and such failure or inability is continuing. However, if the failure to take certain actions is caused by the non-payment by the Issuer of any fee or indemnity due to the Agent under the Finance Documents or by any reason described in Clause 21.2(i), such failure must continue for at least 40 Business Days after notice pursuant to Clause 21.2(m) before a Bondholder may take any action referred to in Clause 24(a).

(c)     The provisions of Clause 24(a) shall not in any way limit an individual Bondholder's right to claim and enforce payments which are due to it under Clause 9.4 (*Mandatory repurchase due to a Change of Control Event (put option)*) or Clause 9.5 (*Mandatory repurchase due to an Equity Listing Event (Reverse Equity Claw Back) (put option)*) or other payments which are due by the Issuer to some but not all Bondholders.

## 25.     Prescription

(a)     The right to receive repayment of the principal of the Bonds shall be prescribed and become void ten years from the Redemption Date. The right to receive payment of interest (excluding any capitalised interest) shall be prescribed and become void three years from the relevant due date for payment. The Issuer is entitled to any funds set aside for payments in respect of which the Bondholders' right to receive payment has been prescribed and has become void.

(b)     If a limitation period is duly interrupted in accordance with the Swedish Act on Limitations (Sw. *preskriptionslag (1981:130)*), a new limitation period of ten years with respect to the right to receive repayment of the principal of the Bonds, and of three years with respect to receive payment of interest (excluding capitalised interest) will commence, in both cases calculated from the date of interruption of the limitation period, as such date is determined pursuant to the provisions of the Swedish Act on Limitations.

## 26.     Notices and Press Releases

### 26.1    Notices

(a)     Written notices to the Bondholders made by the Agent will be sent to the Bondholders via the CSD. Any such notice or communication will be deemed to be given or made via the CSD when sent from the CSD.

(b)     Unless otherwise specifically provided, any notice or other communication to be made under or in connection with the Finance Documents:

        (i)      if to the Agent, shall be given at the address registered with the Swedish Companies Registration Office (Sw. *Bolagsverket*) on the Business Day

prior to dispatch or, if sent by email by the Issuer, to the email address notified by the Agent from time to time;

(ii) if to the Issuer, shall be given at the address registered with the Swedish Companies Registration Office on the Business Day prior to dispatch or if sent by email by the Agent, to the email address notified by the Issuer to the Agent from time to time; and

(iii) if to the Bondholders, pursuant to paragraph (a) above. A notice to the Bondholders shall also be published on the websites of the Issuer and the Agent.

(c) Unless otherwise specifically provided, any notice or other communication made by one Person to another under or in connection with the Finance Documents shall be sent by way of courier, personal delivery or letter, or if between the Issuer and the Agent, by email, and will only be effective:

(i) in case of courier or personal delivery, when it has been left at the address specified in paragraph (b) above;

(ii) in case of letter, three Business Days after being deposited postage prepaid in an envelope addressed to the address specified in paragraph (b) above; or

(iii) in case of email, on the day of dispatch (unless a delivery failure message was received by the sender), save that any notice or other communication sent by email that is sent after 5.00 pm in the place of receipt shall be deemed only to become effective on the following day.

(d) Any notice which shall be provided to the Bondholders in physical form pursuant to these Terms and Conditions may, at the discretion of the Agent, be limited to:

(i) a cover letter, which shall include:

(A) all information needed in order for Bondholders to exercise their rights under the Finance Documents;

(B) details of where Bondholders can retrieve additional information;

(C) contact details to the Agent; and

(D) an instruction to contact the Agent should any Bondholder wish to receive the additional information by regular mail; and

(ii) copies of any document needed in order for Bondholder to exercise their rights under the Finance Documents.

(e) Failure to send a notice or other communication to a Bondholder or any defect in it shall not affect its sufficiency with respect to other Bondholders.

### 26.2 Press releases

(a) Any notice that the Issuer or the Agent shall send to the Bondholders pursuant to Clauses 11.1(d), 14.11(c), 16(p), 17(a), 18(a) and 19(c) shall also be published by way of press release by the Issuer or the Agent, as applicable.

(b) In addition to Clause 26.2(a), if any information relating to the Bonds or the Group contained in a notice the Agent may send to the Bondholders under these Terms and Conditions has not already been made public by way of a press release, the Agent shall before it sends such information to the Bondholders give the Issuer the opportunity to issue a press release containing such information. If the Issuer does not promptly issue a press release and the Agent considers it necessary to issue a press release containing such information before it can lawfully send a notice containing such information to the Bondholders, the Agent shall be entitled to issue such press release.

## 27. Force Majeure and Limitation of Liability

(a) None of the Agent, the Security Agent or the Paying Agent shall be held responsible for any damage arising out of any legal enactment, or any measure taken by a public authority, or war, strike, lockout, boycott, blockade or any other similar circumstance (a "**Force Majeure Event**"). The reservation in respect of strikes, lockouts, boycotts and blockades applies even if the Agent, the Security Agent or the Paying Agent itself takes such measures, or is subject to such measures.

(b) The Paying Agent shall have no liability to the Bondholders if it has observed reasonable care. The Paying Agent shall never be responsible for indirect damage with exception of gross negligence and wilful misconduct.

(c) Should a Force Majeure Event arise which prevents the Agent, the Security Agent or the Paying Agent from taking any action required to comply with these Terms and Conditions, such action may be postponed until the obstacle has been removed.

(d) The provisions in this Clause 27 apply unless they are inconsistent with the provisions of the applicable securities registration legislation which provisions shall take precedence.

## 28. Governing Law and Jurisdiction

(a) These Terms and Conditions, and any non-contractual obligations arising out of or in connection therewith, shall be governed by and construed in accordance with the laws of Sweden.

(b) The Issuer submits to the non-exclusive jurisdiction of the District Court of Stockholm (Sw. *Stockholms tingsrätt*).

We hereby certify that the above terms and conditions are binding upon ourselves.

**Go North Group AB (publ)**
as Issuer

Name: Johan Hallenby

We hereby undertake to act in accordance with the above terms and conditions to the extent they refer to us.

**Intertrust (Sweden) AB**

as Agent and Security Agent

_____

Name: Norea Marklund

Mia Fogelberg

**AGREED SECURITY PRINCIPLES**

The Transaction Security, the Guarantees, the Security Documents and the Guarantee and Adherence Agreement shall be subject to the following principles (the "**Agreed Security Principles**"):

(a) if required or customary under local law, Guarantees and Transaction Security will be limited to the extent required by any such local legal requirements;

(b) general statutory limitations (e.g. financial assistance, corporate benefit, capitalisation rules and retention of title claims) may limit the ability of the Issuer and each Guarantor to provide Transaction Security and Guarantee or require that such Transaction Security and Guarantee is limited by an amount or otherwise;

(c) the Issuer and the Guarantors shall not be required to grant Guarantee or enter into Security Documents if it would conflict with the fiduciary duties of their directors or contravene any legal prohibition or result in a material risk of personal or criminal liability on the part of any officer (as confirmed by a reputable local legal counsel in such jurisdiction);

(d) Security Documents and the Guarantee and Adherence Agreement shall operate to create security and guarantees rather than to impose any new commercial obligations and shall, accordingly, not contain additional or duplicate representations or undertakings (including, for the avoidance of doubt, reporting requirements) to those contained in the Terms and Conditions unless required for the creation, perfection or preservation of the Transaction Security or Guarantee and shall not be unduly burdensome on the relevant Group Company or interfere unreasonably with the operation of its business;

(e) perfection of Transaction Security or granting of Guarantees will not be required if it would materially adversely affect the ability of the Issuer or the relevant Guarantor to conduct its operations or business' in the ordinary course;

(f) the Issuer and the Guarantors shall not be under an obligation to grant Transaction Security over any claims pursuant to any cash pool arrangement or over any intra-group loans other than the Material Intercompany Loan;

(g) the Issuer and the Guarantors shall be permitted to pay interest (until the occurrence of an Event of Default and for as long as it is continuing) but not principal in relation to any Material Intercompany Loan being subject to Transaction Security if required under applicable law to perfect the Transaction Security;

(h) the Issuer and the Guarantors shall, until the occurrence of an Event of Default and for as long as it is continuing, be permitted to pay and receive dividend in relation to any shares being subject to Transaction Security provided that it is not prohibited by the Terms and Conditions;

(i) the Issuer and the Guarantors shall not be under an obligation to grant Guarantees or Transaction Security over any assets which would impose a stamp duty, taxes, notary fees, translation fees, registration fees or similar costs or charges on any Group Company or the Agent unless such costs amounts to less than SEK 100,000 (or the equivalent thereof in any other currency);

(j)  the Issuer and the Guarantors shall not be under an obligation to grant any Transaction Security or Guarantee if it would be illegal or impossible for such Group Company (as confirmed by a reputable local legal counsel in such jurisdiction);

(k)  the Issuer and the Guarantors shall not be under an obligation to grant any Transaction Security or Guarantee if it is not permitted or possible under local law to appoint the Agent to act as agent on behalf of the bondholders (other than through a parallel debt agreement) or if it is required that each bondholder is specified or identified;

(l)  the Issuer and the Guarantors shall not be under an obligation to grant any Transaction Security or Guarantee if there is a requirement for such company or the Agent to obtain or maintain licenses, permissions, establish a place of business or similar in any jurisdiction for the purpose of granting or holding such Transaction Security or Guarantee (as confirmed by a reputable local legal counsel in such jurisdiction);

(m)  the Issuer and the Guarantors shall not be under an obligation to grant any Transaction Security or Guarantee if there is a requirement for such company or its shareholder or the Agent to deposit cash or capitalise the relevant Guarantor in any jurisdiction for the purpose of granting or holding such Transaction Security or Guarantee (as confirmed by a reputable local legal counsel in such jurisdiction);

(n)  an acknowledgement, countersignature or confirmation on a notice of pledge or similar to be delivered in connection with the granting of Transaction Security or Guarantee by another party than a Group Company shall only be required to be collected and delivered by the relevant Group Company on a best effort basis;

(o)  if a Guarantee or Transaction Security is not possible to grant when ensuring a Group Company the rights included in these Agreed Security Principles, the obligation to grant such Guarantee or Transaction Security shall cease;

(p)  Transaction Security will not be enforceable until an Event of Default has occurred and is continuing; and

(q)  a power of attorney (including, but not limited to, in respect of voting rights appertaining to any shares) granted under any Security Document shall only be exercisable following the occurrence of an Event of Default and for as long as it is continuing and shall be issued upon the entering into of the relevant Security Document and be renewed upon request.

The Agent shall have a right to consult with a local legal counsel in a relevant jurisdiction in order to verify and confirm compliance with the Agreed Security Principles in relation to a Transaction Security and/or Guarantee. The costs for such local legal counsel shall be borne or reimbursed by the Issuer and the Agent is not required to seek the Issuer's confirmation or approval prior to engaging such local legal counsel.