# ASSET PURCHASE AGREEMENT

This agreement (the "**Agreement**") is effective on the 1 April 2023 (the "**Effective Date**") and has been entered into by and between;

(1) **Go North Group AB**, a Swedish company registered under no. 559252-2188 ("**Go North**"), having its registered address at Norra Allégatan 5, 413 01 Göteborg, Sweden, and email address legal@gonorth.co; and

(2) **BSB INDUSTRIES LLC**, a US company (the "**Seller**"), having its registered address at PO Box 29, Matamoras, PA 18336, and email address industriesbsb@gmail.com.

The Parties in (1)-(2) above are hereinafter in the Agreement collectively referred to as the "**Parties**" and individually referred to as a "**Party**".

## 1. BACKGROUND

1.1 The group of companies which Go North is part of is an ecommerce aggregator which business mainly consists of the acquisition of businesses and brands. The Seller's business mainly consists of selling toys and games online. As part of the Seller's business, the Seller offers, inter alia, products under the brand **PLAYVIBE and PLAYBEA**. Products are offered through an Amazon FBA account which the Seller holds and operates, as well as, eventually, through other sales channels included in the Business.

1.2 Go North wishes to acquire, and the Seller wishes to sell, certain assets which are part of the Seller's operations as set forth in the Agreement. In the light of the above, the Parties have entered into the Agreement and the Agreement is to be in effect as from the Effective Date even if it signed by all Parties at a later date (such date is referred to as the "**Signing Date**").

## 2. TRANSFER OF THE BUSINESS

2.1 The Parties agree that Go North shall purchase the assets listed in Schedule 2.1A hereto (the "**Business**") from the Seller according to the terms set forth in the Agreement. The Business also includes the inventory (of products) as on the Effective Date (specified in Schedule 2.1B (the "**Inventory**")).

2.2 For the avoidance of doubt, the Parties agree that the Seller's assets as listed in Schedule 2.2 are not included in the Business. The Parties agree that the cash within the Seller's account(s) related to the sales from the Seller's sales channels before the Effective Date, belongs to the Seller and is not part of the Business (regardless of whether or not Go North acquires such accounts as part of the transfer according to the Agreement). Consequently, the Parties agree that all income from any asset included in the Business that relates to the time thereafter shall accrue with Go North (including, but not limited to, any and all cash as well as receivables generated from sales from the Seller's sales channels listed in Schedule 2.1A as from the Effective Date).

2.3 All rights to the Business, including the intellectual property rights and other assets embodied therein, are, notwithstanding anything to the contrary contained herein, transferred to Go North on the Effective Date, subject to what is set forth herein.

2.4 The Parties' intention is that no employees shall be included in the transfer and therefore not become employees of Go North in connection with the transfer of the Business as set forth in the Agreement. If any person who is or was an employee of the Seller claims that he/she shall have the right to be employed by Go North, Go North shall have the right to terminate the Agreement with immediate effect (Swedish: *häva*) and to claim damages from the Seller. If required by Go North, the Seller shall provide Go North with a written confirmation signed by the Seller's employee(s) where such employee(s) confirm that they waive any and all rights that they may have to become employed by Go North as a result of the transfer of the Business.

2.5 Notwithstanding anything contained herein to the contrary, subject to the terms and conditions set forth herein, Go North shall only assume and agree to pay, perform and discharge those Liabilities of Seller that are expressly set forth on Schedule 2.5 attached hereto (collectively, the "**Assumed Liabilities**"), and no other liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise ("**Liabilities**"). Go North is not assuming, and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its affiliates of any kind or nature whatsoever other than the Assumed Liabilities (the "**Excluded Liabilities**").

Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

Seller shall, and shall cause each of its affiliates to, pay and satisfy in due course all Excluded Liabilities which they are obligated to pay and satisfy.

## 3. PURCHASE PRICE AND PAYMENT

3.1 The purchase price for the Business (excluding the Inventory) includes the following parts the Upfront Payment, the Earnout Payment 1, Earn out Payment 2, and the Pre-Signing Profit (all as defined below) (collectively referred to as the "**Purchase Price**") and all stated is United States Dollars):

| Definition | Amount (USD) | Description and payment |
|---|---|---|
| | | |
| **Upfront Payment** | $8,905,041 | to be adjusted according to Section 7 and otherwise as set forth in this Agreement. The non-adjusted Upfront Payment shall be paid to the escrow account as specified below within two (2) business days from the Signing Date (or, if later, within five working days from when the Escrow Agreement (as defined below) has been signed) and shall be released to Seller on the Acceptance Date. |
| **Pre-Signing Profit** | Estimated to be USD 800,000 | to be determined and adjusted according to Section7.2. |
| **Earnout 1** | Estimated to be USD $2,968,347 | shall be equal to the Net Profit of the Business for the period between 1 February 2023 and 31 January 2024 ("**Earnout Period 1**") provided that (i) the Seller fulfils Working Requirement 1 and (ii) that there are no material breach against any of the Seller's Warranties. Earnout 1 shall be paid within 10 business days after Earnout Period 1. |
| **Earnout 2** | Estimated to be USD $2,968,347 | shall be equal to the Net Profit of the Business for the period between 1 February 2024 and 31 January 2025 ("**Earnout Period 2**") provided that (i) the Seller fulfils Working Requirement 1, (ii) Working Requirement 2 and (ii) that there are no material breach against any of the Seller's Warranties. Earnout 2 shall be paid within 10 business days after Earnout Period 2. |

3.2 To fulfil the "**Working Requirement 1**", the Seller shall continue to operate the Business as previously conducted (and reasonably comply with instructions of Go North regarding such operations, but subject to the reasonable judgement of Seller it being understood by Go North that consent be required from Seller to take action that differs from Seller's preferred approach) and always in accordance with Amazon's terms and conditions, throughout Earnout Period 1 such work being defined and limited to Schedule 3.2. During Earnout Period 1: Seller shall have full user access to seller central (except user permissions and bank details); and to seller legend https://app.sellerlegend.com/; and have the right to request a copy of the full cost of goods, including but not limited to shipping and 3PL and Go North shall deliver same within 10 days of request.

3.3 To fulfil the "**Working Requirement 2**", BSB INDUSTRIES LLC shall provide consulting services to Go North, relating to Go North's continued running of the Business, where BSB INDUSTRIES LLC shall assist Go North in its operation of the Business with up to 10 hours of consultation per week during the first two month's of Earnout Period 2 and thereafter with up to 5 hours per week during the remainder of Earnout Period 2. Consultation shall only be required in the event Go North requests such consultation services. During Earnout Period 2: Seller shall have full user access to seller central (except user permissions and bank details); and to seller legend https://app.sellerlegend.com/; and have the right to request a copy of the full cost of goods, including but not limited to shipping and 3PL and Go North shall deliver same within 10 days of request.

3.4 Payment of the Upfront Payment shall be made to the escrow account specified in the escrow agreement entered into between the Seller, Go North and an escrow agent (the "**Escrow Agent**") in connection with the signing of the Agreement or as soon as possible after the Agreement having been signed (the "**Escrow**

**Agreement**") to be held and distributed to the Seller (or returned to Go North) in each case pursuant to the terms of this Agreement and the Escrow Agreement, which include that the Upfront Payment be released to Seller on the Acceptance Date. The date when payment of the Upfront Payment is made to the Escrow Account is referred to as the "**Escrow Payment Date**". All other payments to the Seller according to the Agreement shall be made to the bank account appointed by the Seller being as follows:

BSB Industries LLC

R: 021000021

A: 601608067

40 Fort Worth PL Monroe NY 10950 .

3.5     Provided that Seller fulfils Working Requirement 1, Go North undertakes not to, without the Seller's consent (which shall not be unreasonably withheld), take any action or make any decision (including not making payment in time to vendors for reasonable purchases that are made in the ordinary course of business) which is in Seller's sole discretion, shall negatively affect Earnout 1 to the detriment of the Seller including but not limited to by transferring the Business or a part thereof to another company within the Go North group of companies or to anyone closely related to Go North.  Should Go North act in such disloyal, irresponsible, way without the Seller's consent or in a way not advised to act by the Seller ("**Inappropriate Conduct**"), whether or not in order to affect the amount of Earnout 1, the amount of Earnout 1 shall be adjusted as if Go North would not have acted in such way. For the avoidance of doubt, Go North shall, during Earnout Period 1 operate the Business in the manner advised by the Seller and any change in such operation without consent of the Seller shall be deemed Inappropriate Conduct in which case if Earnout 1 is any lower than the amount predicted or estimated then amount of Earnout 1 shall be adjusted upward as if Go North would not have acted in such way. Inappropriate Conduct shall also include a scenario where Go North have received consent from Seller to operate the Business in a different manner than as advised by the Seller, and then sometime thereafter Seller informs Go North that such approach is detrimental to the Business and can show how such approach is causing the Business to make less profit or lose profit and Go North elects not to follow Seller's recommendation.

3.6     Go North undertakes not to during Earnout Period 2, without the Seller's consent (which shall not be unreasonably withheld), take any action or make any decision regarding PPC spend, deals and/or price changes (except for price changes of maximum 15 %) ("**Major Decisions**") whether intended or not intended to negatively affect Earnout 2 to the detriment of the Seller. In the event Go North wishes to make a Major Decision during Earnout Period 2, Go North shall (by email) request the Seller's consent thereof. If the Seller does not object to the Major Decision proposed by Go North within 24 hours after the email being sent to the Seller (except in the case such email was sent during the hours of one hour before Sunset on a Friday through to the time for sunset on a Saturday based on a New York City time schedule,, in which case the time period shall be 48 hours) the Seller shall be deemed to have provided its consent to the proposed Major Decision. Should Go North during Earnout Period 2 act in a manner  that negatively affects  the Earnout 2 including but not limited to behaving in a disloyal way, not heeding Seller's advice to change or maintain Go North's management of the Business and or making a Major Decision without the Seller's consent and whether or not in order to affect the amount of Earnout 2, the amount of Earnout 2 shall be adjusted as if Go North would not have acted in such way.

3.7     All transfer, documentary, sales, use, stamp, registration, value added, and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any tax return or other document with respect to such taxes or fees (and Go North shall cooperate with respect thereto as necessary); provided however, in the event there is any value added tax due in Sweden as a result of the transaction contemplated hereby, Go North shall pay perform and discharge such value added tax. Go North and Seller hereby waive compliance by Seller with the provisions of the "bulk sales," "bulk transfer" or similar laws of any jurisdiction, except that in the event Seller requests Go North to merely file paperwork with the state regarding the bulk sale status of this agreement at a future date through and including the Earnout Period 2, Go North shall reasonably comply at no cost to Go North . Seller shall indemnify, defend, and hold Go North harmless for any losses arising out of or related to either party's failure to file a bulk sales notice, or otherwise by operation of contract or law.

3.8     Seller shall be reimbursed for all of the outstanding deposits it has paid and outstanding balance for inventory of the Business (the "**PO Amount**") and such payment shall be made by Go North on the 6th of October 2023 at the latest, time being of the essence, directly to Seller's bank account. In the event Go North does not make

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

such payment in time, Go North shall pay to the Seller a late payment fee of eight percent (8 %) of the PO Amount, and such late payment fee shall be due immediately.

3.9     Seller and Go North agree that the Purchase Price shall be allocated among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations thereunder and Schedule 3.9 attached hereto ("**Allocation Schedule**"). Go North (if required) and the Seller each agree to file Internal Revenue Service Form 8594, and all federal, state, local and foreign tax returns, in accordance with the Allocation Schedule. Any adjustments to the Purchase Price pursuant to this Agreement shall be allocated in a manner consistent with the Allocation Schedule.

## 4.     PURCHASE OF THE INVENTORY

The Parties agree that Go North shall pay for the Inventory according to the prices (which shall be landed cost) as set out in Schedule 2.1B (the "**Inventory Payment**"). The Inventory Payment shall be made on the 31 January 2024 at the latest.

## 5.     MIGRATION OF THE BUSINESS ETC.

5.1     The Parties undertake to participate to the migration of the Business as set forth in this Section 5. Immediately within two (2) business days after Escrow Payment Date (the "**Migration Commencement Date**"), the process of transferring the assets in the Business shall commence. More specifically, this means that the Seller, as per the Migration Commencement Date or as soon as possible thereafter, for instance, as applicable, shall take the following actions to the best of its ability:

i)      to the fullest extent permitted by law, reasonably ensure that Go North is given/maintains full insight in the Business (for instance through login details to the Seller's FBA account and other eventual accounts as set forth in Schedule 2.1A);

ii)     list Go North as the holder of the relevant FBA account(s) and Seller Central Account(s), and other eventual accounts as set forth in Schedule 2.1A (a soon as commercially possible upon Go North's written request);

iii)    in writing and, if possible, electronically provide Go North with all information and documentation, including information about username and password, which are required for Go North to be able to fully make use of all of the assets within the Business;

iv)     in relation to all (legal as well as natural) persons who are parties in any agreement which is included in the Business or who may be affected due to the transfer of the Business (such as a supplier of products which are part of the Business), provide Go North with (a) copies of all such agreements, and (b) a written consent to the relevant agreement being transferred (if such consent is required), or otherwise provide proof of the relevant party having been duly informed about, and accepts, the transfer;

v)      sign all relevant intellectual property assignment agreements and assist (to the extent reasonably requested by Go North) with the re-registration of trademarks, domains and other assets which, according to current registration, are registered on the Seller and take all necessary actions for such assets to be registered on Go North; and

vi)     take all other reasonable actions which are commercially necessary for the full title and ownership of the Business including all rights and assets embodied therein to be transferred to Go North.

5.2     The transfer of the Business requires a constructive dialogue and close cooperation between the Parties, and the Parties undertake to reasonably participate to such. Each Party shall, upon the other Party's request provide such information as the other Party reasonably needs for the transfer of the Business to be implemented.

5.3     When the Seller considers that the transfer of the Business is completed, the Seller shall give Go North written notice thereof, by email . Thereafter, Go North shall be given the opportunity to control the Business subject to the terms herein including but not limited to the terms set forth in 3.3 above If the Business or any part thereof materially deviate from what Go North reasonably had reason to expect, Go North has the right to send written notice of same to Seller and Seller shall either respond advising why such alleged deviation is not in fact a deviation or Seller to cure within 30 days thereafter and if no such explanation or cure is provided then immediately terminate the Agreement (Swedish: *häva*). Should the Business be defective (i.e. materially deviate from what Go North reasonably had reason to expect) Go North shall be entitled to a reasonable price

reduction in accordance with the principles set forth in Section 9. For the sake of clarity, Go North shall have the right to claim the Business is defective or materially deviates from what Go North reasonably has reason to expect if such deviation occurred prior to the Signing Date and Go North has proof that Seller hid such deviation from Go North.

5.4     The transfer of the Business shall be deemed completed when each Party has confirmed to the other in writing by email that it accepts the transfer. The Party who provides such confirmation after the other Party, shall be considered to have done so on the "**Acceptance Date**". In the event Seller provides such confirmation to Go North, and Go North does not respond within 2 business days, Go North shall be deemed to have provided such confirmation and such date shall be deemed the Acceptance Date. In the event Go North responds within such 2 business days, stating that the transfer of the Business has not been completed, Go North must state with specificity what items it believes to be outstanding. If Seller can show that those items have been satisfied thereafter, and after notice to Go North that the open items have been satisfied, the transfer of the Business shall be completed and the Acceptance Date shall be set as the following business day of such notice.

5.5     Unless the Parties have agreed otherwise in whole or in part, Go North shall bear the reasonable costs of the actions required for the transfer of the Business as set out in Clause 5.1. To the extent the Seller makes expenses in connection with the transfer of the Business Go North is however only required to compensate the Seller for such if the Seller proves its costs with a receipt or equivalent documentation.

5.6     If a Party materially breaches any of its undertakings as set forth in Clause 5.1 or 5.2, the other Party has the right to notify the other in writing and in the event the alleged defaulting party does not cure same within ten (10) business day thereafter, immediately terminate the Agreement (Swedish: *häva*) and if Go North is the defaulting party and does not cure such material breach within the ten (10) business days after the Seller's written notice, Seller shall have the right to an amount of liquidated damages of USD 100,000 and to get the Business back whereupon the Business shall be transferred back to the Seller and Seller shall have no liability whatsoever to Go North. Go North shall cooperate with Seller in the same manner in which Seller is obligated to cooperate with Go North to transfer the Business efficiently and effectively back to the Seller. In the event Go North does not do so in the reasonable judgment of the Seller, Seller shall have any and all rights and remedies available to pursue Seller at law including cross border dispute through Sweden and any and all rights at equity including but not limited to injunction to stop Go North from further operations of the Business.

## 6.     THE TIME BETWEEN THE SIGNING DATE AND THE ACCEPTANCE DATE

6.1     During the time between the Signing Date and the Acceptance Date, the Seller has and shall conduct its operations which concern any asset which is part of the Business according to the same principles as before (however not to the extent that is not possible due to the actions taken or to be taken in accordance with Section 5), unless Go North in writing instructs or agrees otherwise. This means that the Seller, among other things, has ensured and shall ensure the following:

i)      agreements and other undertakings which concern any asset which is part of the Business, or which affects or is likely to affect any such asset, has been and shall be entered into on such terms which are customary in the relevant industry, and no price changes or discount terms of products which are part of the Business has been or shall be introduced except if Seller at its sole discretion has decided to modify pricing in an effort to maintain or increase the performance of the Business;

ii)     the Seller has not nor shall terminate any agreement which are essential for the purposes of the Business or any part thereof;

iii)    no decisions or actions which are of essential importance for the Business or any part thereof has been or shall be made/taken; and

iv)     the Seller has not and shall not divest or acquire or in a similar manner dispose of the assets in the Business (or parts thereof), other than in the ordinary course of business.

6.2     If the Seller has breached or breaches any of its undertakings as set out in Clause 6.1, Go North has the right to send written notice to Seller and if Seller does not cure within ten (10) days business thereafter  either proceed (i) with a price reductions commensurate to the new value of the Business  as determined in accordance with the principles of Clause 5.3, or (ii)  in the event of a material breach to immediately terminate the Agreement (Swedish: *häva*).

6.3     Costs for, and revenues from, the Business for the period from the Effective shall be borne by and inure to Go North.

# 7. FINANCIAL RECONCILIATION

## 7.1 COSTS AND RECEIVABLES BETWEEN SIGNING DATE AND ACCEPTANCE DATE

7.1.1 As soon as possible after the Acceptance Date and in no event later than ten (10) business days thereafter, the Seller and Go North shall, considering the conditions as per the Acceptance Date, compile the payments from the Business and costs of the Business that have been paid to or by the Seller as from the Signing Date up until the Acceptance Date (i.e. the payments from the Business to the Seller as well as other costs that has been paid by the Seller and which is a result of the agreements and assets included in the Business).

7.1.2 Should the amount calculated in accordance with the previous clause be a positive real number, the Seller shall compensate Go North with the corresponding amount. Such compensation shall primarily be made by set-off against the Pre-Signing Profit, secondarily against the Inventory Payment, thirdly as a cash payment from the Seller to Go North. Should the amount calculated in accordance with the previous clause be a negative number, Go North shall pay the corresponding amount to the Seller as supplement to the Upfront Payment (which shall however not be paid to the escrow account but directly to the Seller).

7.1.3 When calculations have been made in accordance with this Section 7.1, the Parties shall instruct the Escrow Agent to release the (adjusted) Upfront Payment to the bank account appointed by the Seller. In the event Go North shall receive compensation in accordance with this Agreement, the Parties shall also instruct the Escrow Agent to release the amount of such compensation to a bank account appointed by Go North. The Escrow Agent shall release the relevant payments within three banking days thereafter.

## 7.2 CALCULATION AND PAYMENT OF THE PRE-SIGNING PROFIT

7.2.1 The purpose of the payment of the Pre-Signing Profit is to make a true-up of the actual Net Profit generated as from the Effective Date until the Signing Date (as the Seller has operated the Business as from the Effective Date whilst the title of the Business is considered to have passed to Go North).

7.2.2 As soon as possible after the Acceptance Date and in no event later than ten (10) business days thereafter, the Seller and Go North shall compile the Net Profit generated by the Business between the Effective Date up until the Signing Date (such compilation of the Net Profit shall be made in accordance with the principles set forth in Schedule 3.1). The result of such compilation will constitute the "**Pre-Signing Profit**".

7.2.3 The Pre-Signing Profit to be paid by the Buyer to the Seller shall be adjusted according to the following;

The amount of the Pre-Signing Profit minus any withdrawals (or other payouts) of funds generated after the Effective Date that has made by the Seller from any accounts included in the Business.

Any such amounts already received by the Seller ("**Received Pre-Signing Profit**") shall, for the avoidance of doubt, be deemed as part of the Pre-Signing Profit and that such parts have been prepaid by Go North.

7.2.4 In the event the Received Pre-Signing Profit is greater than the Pre-Signing Profit, the Seller shall reimburse Go North (and such reimbursement shall be considered to be a reduction of the Purchase Price). Such reimbursement shall primarily be made by set-off against the Inventory Payment, secondarily against the Upfront Payment and thirdly as a cash payment from the Seller to Go North.

7.2.5 When calculations have been made in accordance with this Section 7.2 and if it thereby is determined that Go North shall pay (a, potentially, adjusted amount of) the Pre-Signing Profit, Go North shall pay such amount to the Seller within ten (10) business days after the Pre-Signing Profit to be paid has been finally determined.

# 8. THE SELLER'S REPRESENTATIONS AND WARRANTIES

## 8.1 INTRODUCTION

The Seller provides to the best of its knowledge the representations and warranties set of in this Section 8 to the benefit of Go North (the "**Representations and Warranties**"). The Representations and Warranties pertain to the facts of the Business, and are true correct, and complete, as of the Effective Date as well as on the Acceptance Date, unless otherwise specifically stated. The Seller shall however have no liability under the Warranties pertaining to the time between the Effective Date and the Acceptance Date to the extent the deviation is a direct or indirect result of any action taken by Go North or to which Go North has provided its consent.

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

**THE TRANSFER**

8.2.1    The transfer of the Business does not violate any provision of law, any decision of a court or competent authority or any agreement.

8.2.2    The Seller has the right to enter into the Agreement and thereby commit to the rights and obligations as set out herein.

8.3    **THE BUSINESS AND INTELLECTUAL PROPERTY RIGHTS**

8.3.1    The Seller holds full title to all parts of the Business including all intellectual property rights and other rights and assets embodied therein, and the Business including such assets and rights contained therein are free and clear from any option, lien, mortgage, claim, pre-emption right or any other encumbrance.

8.3.2    Neither the Business nor any of the rights or other assets embodied therein are encumbered by licenses.

8.3.3    The Seller is entitled to exercise the third party intellectual property rights which are used in the Business (including the assets contained therein).

8.3.4    The goods contained in the Inventory are marketable in relation to the product samples that the Seller has provided to Go North, and in mint condition.

8.4    **CONDUCTING OF THE BUSINESS**

8.4.1    The Seller has carried out the operation of the Business (and all actions taken under and in relation to sale of products under the Seller's FBA account has been carried out) in accordance with any and all third party policies and terms governing such operations.

8.4.2    The Seller complies with the Amazon terms of service and other Amazon instructions and policies applicable to the Seller for the purpose of the Business To the extent the Seller has been instructed by Amazon (or anyone acting on behalf of Amazon) to cease breaching the Amazon terms of service or any Amazon instructions/policies, the Seller has complied with such instructions. To the extent the Seller has otherwise been committing a breach of the Amazon terms of service or any Amazon instructions/policies, the Seller has ceased committing such breach.

8.5    **MANUFACTURING COSTS ETC.**

8.5.1    The Seller has, as per the Acceptance Date, received such written confirmation or other proof as referred to in Clause 5.1iv).

8.6    **PERMITS AND REGULATIONS**

The Seller holds the licences and permits which are necessary to carry out such part of its operations which involve the Business or a part thereof. Such part of the Seller's operations has been carried out, and shall be carried out until the Acceptance Date, in accordance with all applicable laws, ordinances, public authority regulations, orders, and corresponding mandates from courts or public authorities, as well as in accordance with all permits applicable to such business activities. To the best of the Seller's knowledge, no licences or permits will be revoked or otherwise limited.

The Seller is a limited liability company duly organized validly existing and in good standing under the laws of New York and has full power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. Seller is in good standing in each jurisdiction in which the ownership of the Assets or the operation of the Business as currently conducted.

8.7    **INSOLVENCY ETC.**

The Seller has not suspended its payments (Swedish: *ställt in sina betalningar*), entered into composition procedure (Swedish: *inlett ackordförhandling*), filed for bankruptcy (Swedish: *ansökt om konkurs*), submitted a request regarding company reorganisation (Swedish: *ansökt om företagsrekonstruktion*) or similar, or entered into liquidation (Swedish: *fattat beslut om likvidation*).

8.8    **EMPLOYEES**

The Seller has fulfilled its eventual obligation to negotiate according to applicable law (Swedish: *förhandlingsskyldighet*) and obtained a written verification from all persons who are employed by the Seller

that each such employee objects to his/her employment being transferred to Go North.

<b>8.9 THIRD PARTY LIABILITY/ LEGAL CLAIMS</b>

8.9.1 No claims have been made against the Seller in relation to the Business or any part thereof.

8.9.2 To the best of the Seller's knowledge, no complaint has been made in respect of goods sold by the Seller that includes such rights which are included in the Business other than complaints which are standard in the industry, and there is no reason to assume that such atypical complaints will be made. In the event of a complaint pertaining to goods sold prior to the Signing Date, Go North shall, on the Seller's behalf and at the Seller's expense, handle the claim in exchange for compensation corresponding to Go North's cost price. The Seller shall also hold Go North harmless from all claims and costs attributable to such claim or dispute except for other than punitive, special and consequential damages.

<b>8.10 INFORMATION</b>

To the best of Seller's knowledge, who is not an accountant, information pertaining to the Business, including the assets contained therein which has been provided by the Seller is complete and accurate, and gives a true and fair view of the financial position and earnings of the part of the Seller's operations which are relevant for the purpose of the Agreement. Go North is in receipt of said information represents, warrants and covenants that it has reviewed same and had an opportunity to conduct its own analysis of the Seller and based on such independent analysis (not relying on said information alone) and concluded that the information provided is indeed complete and accurate, and gives a true and fair view of the financial position and earnings of the part of the Seller's operations which are relevant for the purpose of the Agreement. Accordingly, the Upfront Payment on the Acceptance Date and as may be adjusted per the terms herein shall not be subject to change with regard to the information that is the subject of this Section 8.10 in any event including but not limited to the event said information has or had any errors and notwithstanding anything else to the contrary contained herein Go North shall not be able to claim any damages whatsoever against Seller in this regard since it has had its own opportunity to conduct its own analysis of the Seller, except if such errors have been provided intentionally (and not mistakenly) by the Seller in order to not give a true and fair view of the Business in which case a claim in damages would be limited to the amount Go North can show is the difference between the represented amount and the actual amount but no more than the amount Seller ever received.

<b>9. INDEMNIFICATION CLAIMS</b>

9.1 Go North has only conducted a limited investigation (due diligence) of the Business. The Seller shall not be liable under the Warranties to the extent Go North knew of the deviation prior to the Signing Date.

9.2 Seller Indemnification. Subject to the other terms and conditions set forth herein, Seller shall indemnify and defend Go North, and its affiliates and their respective representatives (collectively, the "**Buyer Indemnitees**") against, and shall hold each of them harmless from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnitees based upon, arising out of, with respect to or by reason of: (a) any intentional inaccuracy in or breach of any of the representations or warranties of Seller contained in this Agreement; (b) any intentional breach beyond any notice and cure period included herein or at law or non-fulfilment of any covenant, agreement, or obligation beyond any notice and cure period included herein or at law to be performed by Seller pursuant to this Agreement; (c) any Excluded Liabilities; (d) the alleged infringement of Laltitude, LLC's design patents, as presented to the Seller in communication from Bochner PLLC dated 1 August 2023 and as disclosed to Go North; or (e) the business, operations, assets, or obligations of Seller or any of its affiliates conducted, existing, or arising prior to the Signing Date. For purposes of this Agreement, "Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, loss of sales and profits, compliance related expenses, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; provided, however, that "Losses" shall not include punitive damages, except to the extent actually awarded to a Governmental Authority or any other third party.

9.3 When calculating the compensation in relation to each indemnification under Section 9.2(a), only claims referring to individual breaches of the Representations and Warranties. Go North shall only be entitled to compensation if the aggregate claim for Losses under Section 9.2(a) or 9.2(e) exceeds a threshold amount of 3% of the Upfront Payment ("**Basket**"). Once Losses exceed the Basket, Go North shall be entitled to the amount corresponding to the aggregate Losses. However, under no circumstances shall the total compensation for Losses under Section 9.2(a) and 9.2(e) exceed 25 % of the Upfront Payment subject to 9.6.

9.4     Go North shall give written notice of any breach of any Representation and warranty within a reasonable time from Go North's discovery of the breach of the Representation and Warranties or deviation. Go North shall have no obligation to conduct an investigation of the Business after the Signing Date. Go North shall not be entitled to assert a breach of the Representations and Warranties where the claim is made later than nine (9) months after the Acceptance Date.

9.5     Go North shall not be entitled to any other remedy in the event of a Breach of Warranty unless explicitly stated herein, Go North shall have no other rights at law or equity against Seller impose any liability on Seller.

9.6     Notwithstanding anything contained herein to the contrary, in the event of a claim under Sections 9.2(a) for breach of Sections 8.2, 8.3.1, 8.6, 8.7, 8.9 or a claim against the Seller which is the consequence of fraud, dishonesty, wilful concealment or wilful misrepresentation may be made later than nine (9) months after the Signing Date but no longer than eighteen (18) months after the Acceptance Date and the aggregate Loss to which Go North may be entitled shall be capped at the Purchase Price actually received by Seller.

## 10.    NON-COMPETITION

10.1    The Seller undertakes, during a period of three years from the Acceptance Date, not to directly or indirectly conduct, hold an interest in, or in another manner, promote business activities involving the production, offering, sales, marketing or similar activities in relation to i) the products specified in the Product Catalogue in Schedule 2.1B, or ii) products which are reasonably replaceable with the products in the Product Catalogue meaning that they substantially have the same functions or purpose as such products.

10.2    The Seller undertakes, during a period of three years from the Acceptance Date, not to directly or indirectly endeavour to induce any of the suppliers, customers, resellers, agents or the like, which are connected to or relevant for any asset included in the Business, to terminate or change their business relationship in relation to such assets included in the Business (such as any supplier or reseller of a product which is part of the Business).

10.3    If the Seller commits a breach of Clause 10.1 or 10.2 above, the Seller shall, in relation to each such breach, pay Go North amounting to the Net Profit attributable to the particular product or products of the Business during a period of twelve months prior the Signing Date with which represented direct competition, and such amount shall be capped to the amount Seller actually earned as Net Profit by selling the competitive product ..

10.4    Notwithstanding anything to the contrary, Go North is entitled to claim indemnity corresponding to the actual damage should the damage be greater than the liquidated damages, and the payment of liquidated damages does not exclude other sanctions due to the breach of contract.

## 11.    GO NORTH'S NON-PAYMENT OF EARNOUTS

11.1    In the event Go North fails to pay any of Inventory Payment, Earnout 1 and or Earnout 2 within thirty (30) days after the respective due date, the Seller shall be entitled to a late payment fee of 8 % of the amount of the late payment (which shall be due immediately) from Go North. If Go North fails to make any of Inventory Payment, Earnout 1 and or Earnout 2 within sixty (60) days after the respective due date, the Seller shall be entitled to terminate this Agreement whereupon the Business shall be transferred back to the Seller and Seller shall have no liability whatsoever to Go North. Go North Shall cooperate with Seller in the same manner in which Seller is obligated to cooperate with Go North to transfer the Business efficiently and effectively back to the Seller. In the event Go North does not do so in the reasonable judgment of the Seller, Seller shall have any and all rights and remedies available to pursue Seller at law including cross border dispute through Sweden and any and all rights at equity including but not limited to injunction to stop Go North from further operations of the Business.

## 12.    CONFIDENTIALITY

12.1    The Parties undertake not to disclose to any third party information regarding this Agreement and the negotiations which preceded the Agreement, nor information about the other Party which a Party has received, whether written or oral and irrespective of form.

12.2    In addition, Seller acknowledges that they had access to Confidential Information and that such Confidential Information is confidential and proprietary to the Business and constitutes valuable trade secrets of the Business, which affect, among other things, the successful conduct, furtherance, and protection of the Business and related goodwill. Seller acknowledges that the unauthorized use or disclosure of such Confidential Information is likely to be highly prejudicial to the interests of Go North and its affiliates and their respective

customers, partners, vendors, advertisers, and 3rd party service providers as an invasion of privacy, or an improper disclosure of trade secrets. Seller agrees that a substantial portion of the purchase price is being paid for such Confidential Information and that it represents a substantial investment having great economic and commercial value to G north and constitutes a substantial part of the value to Go North of the Assets and the Business. Seller further acknowledges that Buyer and its Affiliates and the Business would be irreparably damaged if any of the Confidential Information was disclosed to, or used or exploited on behalf of, any Person other than Go North. Accordingly, upon execution of this Agreement, and anytime thereafter, Seller covenants and agrees that Seller shall not, directly or indirectly, without the prior written consent of Go North, disclose, use, exploit, furnish or make accessible to anyone or any other person (other than Go North), any such Confidential Information, except to the extent such disclosure or use is required by applicable Law. Confidential Information shall include any and all information, whether written or oral, concerning the Business. For purposes of this Section, "**Confidential Information**" means information that is not generally known or readily ascertainable through proper means, whether tangible or intangible, including without limitation, algorithms, customer lists, records, designs, formulas, technical processes and other processes, programs, prototypes, systems and techniques specifically related to the Assets, or the Business.

12.3    The confidentiality undertaking does not apply to information which i) at the date of its disclosure is in the public domain or at any time thereafter comes into the public domain (other than by breach of this Agreement), and ii) receiving Party can evidence was in its possession or was independently developed at the time of disclosure and was not obtained, directly or indirectly, by or as a result of breach of a confidentiality obligation. Further, nothing in this confidentiality undertaking shall prevent Go North from using any information provided by any other Party in order to fully enjoy the rights transferred in connection with the Business (such as the right to offer the purchased goods for sale).

12.4    Neither shall this confidentiality undertaking apply to the extent that any Party is required to make a disclosure of information by law or pursuant to any order of court or other competent authority or tribunal or by any applicable stock exchange regulations or the regulations of any other recognised marketplace. In the event that any Party would be required to make any such disclosure, each Party undertakes to give the other Party immediate notice prior to any such disclosure. Each Party also agrees and undertakes to use its best efforts to ensure that any information disclosed under this section, to the extent possible, shall be treated confidentially by anyone receiving such information.

12.5    Go North may publish a press release regarding the acquisition of the Business but may not mention Seller's name or Seller's owner's name. In the event Go North breaches the previous sentence it shall pay Seller USD $100,000.

## 13.    Miscellaneous

13.1    Costs

Subject to Clause 5.5, each Party shall bear its own costs and expenses in connection with the preparation for and the completion of the transactions contemplated by, or otherwise incurred in the performance of such Party's obligations or exercise of its rights under, this Agreement.

13.2    Entire agreement

The Agreement represents the entire understanding and constitutes the whole agreement between the Parties relating to the subject matter hereof and supersedes all prior agreements, covenants, arrangements, communications, representations or warranties, whether oral or written, by any officer, agent, employee or representative of either of the Parties.

13.3    Amendments; Waivers; Successors and Assigns

The Agreement may only be amended, changed or modified by an instrument in writing duly executed by the Parties.

No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Seller Parties may not assign its rights or obligations hereunder without the prior written consent of the Buyer, *provided,*. No assignment, consented to by Buyer, shall relieve the Seller Parties of any of their obligations hereunder.

13.4 **SUBSTITUTION**

If any provisions of this Agreement or the application of it shall be declared or deemed void, invalid or unenforceable in whole or in part for any reason, the remaining provisions of this Agreement shall continue in full force and effect. The Parties shall seek to amend such void, invalid or unenforceable provisions and thereby this Agreement in order to give effect to, so far as it is possible, the spirit of this Agreement and to achieve the purposes intended by the Parties.

13.5 FURTHER ASSURANCES

Following the Signing Date, (i) each of the parties hereto shall, and shall cause their respective affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement; and (ii) Seller shall promptly forward to Buyer any correspondence, documents, notices or other materials received by such parties in connection with or relating to the Business.

13.6 BUSINESS DAY

Reference to "business day(s)" or "working day(s)" herein shall mean any day except any Saturday, any Sunday, or any day which is a federal legal holiday in the United States of America or a public holiday in Sweden or any day on which banking institutions are authorized or required by law to close in the United States of America or Sweden.

## 14. APPLICABLE LAW AND DISPUTES

14.1 This Agreement shall be construed under and governed by the internal laws of the State of New York without regard to its conflict of laws provisions. Any controversy, dispute, or claim arising out of, in connection with, or in relation to the interpretation, performance or breach of this Agreement or any agreement or other instrument executed pursuant hereto or otherwise arising out of the execution of any of the foregoing, including, without limitation, any claim based on contract, tort, or statute, shall be resolved or determined, at the request of any Party, by arbitration conducted in New York, New York, in accordance with the then-existing Rules for Commercial Arbitration of the American Arbitration Association. Any judgment or award rendered by the arbitrator will be final, binding and non-appealable, and judgment may be entered by any State or Federal court having jurisdiction thereof. The arbitrator shall be required to decide the controversy in accordance with applicable substantive law. Any controversy concerning whether a dispute is an arbitrable dispute or as to the interpretation or enforceability of this Section 14.1 shall be determined by the arbitrator. All arbitration proceedings shall be held in the strictest of confidence and all parties and counsel shall be bound by such requirement of confidentiality. The parties intend that this agreement to arbitrate be valid, enforceable and irrevocable. The designation of a situs or a governing law for this Agreement or the arbitration shall not be deemed an election to preclude application of the Federal Arbitration Act, if it would be applicable. In the arbitrator's award, the arbitrator shall allocate, in his or her discretion, among the parties to the arbitration all costs of arbitration, including the fees of the arbitrator and reasonable attorney's fees, costs and expert witness expenses of the parties.

14.2 The Parties undertake and agree that all arbitral proceedings conducted with reference to this arbitration clause will be kept strictly confidential. This confidentiality undertaking shall cover all information disclosed in the course of such arbitral proceedings, as well as any decision or award that is made or declared during the proceedings. Information covered by this confidentiality undertaking may not be disclosed to a third party without the prior consent by the other Party. Exceptions to the foregoing shall only apply to the extent that disclosure may be required of a Party due to mandatory law, an order of a competent court or public authority, or to protect, fulfil or pursue a legitimate legal right or obligation or to enforce or challenge an award.

14.3 In the event there be a dispute between the parties, and there be a conflict of law between Sweden and the United States of America, the law of New York shall apply and the courts in Sweden shall incorporate the terms of this contract to the extent possible into the local law.

_____

The Agreement has been executed in one or multiple copies and signed digitally. Each such signed copy shall be deemed an original and all of which together shall constitute one and the same Agreement, of which each Party shall receive a PDF copy.

Signature on page to follow

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

In witness whereof, the parties hereby have executed this Asset Purchase Agreement by signing below.

**Go North Group AB**:

_____
Johan Hallenby

**Go North Group AB**:

_____
Wilhelm Bergman

**BSB INDUSTRIES LLC**:

_____
David Berkowitz

**SPECIFIC UNDERTAKING**

The undersigned owner of the Seller hereby undertakes to personally adhere to Section 10 (Non-Competition) and 12 (Confidentiality) of this Agreement and thereby agrees to be bound by such provision as being a party thereto. The undersigned furthermore, as a result of the direct and indirect benefit to which he/she will receive as a result of the transactions contemplated hereby, absolutely, unconditionally, and irrevocably guarantees, as for his/her own debt (Swedish: _såsom för egen skuld_) and as primary obligor and not merely as surety, the proper fulfilment by the Seller of the indemnification and compensation of Go North under this Agreement and all other present and future obligations, Liabilities, covenants, and agreements of Seller required to be observed, performed or paid with respect to this Agreement. Any dispute, controversy or claim arising out of or in connection with this undertaking shall be finally settled in accordance with the dispute resolution provisions set out in Section 14 (Applicable law and disputes) of this Agreement.

_____
David Berkowitz

**Schedule 2.1A – The assets included in the Business**

The Business, and the Assets to be purchased, shall comprise the main assets required for its operation, including but not limited to, the following:

a. Amazon Accounts: Seller's Amazon accounts, including all rights related to product listings, reviews, product classification and brand registry;

b. Marketing materials and social media accounts;

c. Product and Supply Chain: All trade, production and supply relations with the producers and suppliers of products distributed by Seller, and all necessary product certifications;

d. IP and Brands: All registered and unregistered intellectual property related to Seller's products and brands, and all new products planned under **PLAYVIBE, PLAYBEA,.**

e. Operational Know-How: Know-how related to the Business operations and the oversight and regulation; and
f. Inventory: All inventory of Seller (new products on stock, in-transit inventory, and down payments on future deliveries).

# Schedule 2.1B – The Inventory, applicable prices and Product Catalogue

**Link to Inventory report:**

**[APA] PlayVibe Inventory Sheet template.V9**

**Go North**

IN WD

Please institute all items in this sheet that are being sold under your brand. Do not strike any item down if it discontinued.

Active
Discontinued
Discontinued

Filled out by:

Date:

11/8/2022

| Seller Central Name | Marketplace (US, GB, DE) | Status (sale drop tool) | Item name | Inventory Detail ASIN | Amazon SKU name | Average sales price (USD) | FBA inventory (FC Transfer) | Inbound | Inventory at 3PL warehouse at relevant (total units) | Inventory at other location at present (total units) | Inventory in 3PL (from Supplier) | Estimated time of arrival to 3PL (total units) | Inventory in 3PL (total units) | Cargo ready date (Production ready) | Supplier Production Cost PER UNIT (US Dollar) | Shipping Cost PER UNIT | COGS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PlayVibe | US | Active | Water Slide | B0C1HHXGL9 PV0516 | | 76 | 0 | | 3600 | | | | | | 160.85 | 5.23 | 166.08 |
| PlayVibe | US | Active | Soccer Swing | B0B9RGR7R9 PV0514 | | 364 | 0 | | | 2 | | | | | 12.75 | 1.77 | 14.52 |
| PlayVibe | US | To be discontinued | Puzzle board with Stand 1500 | B0BNRB31NR PV0510 | | 149 | 0 | 9 | | | 2968 | | | 9/15/22 | 28.13 | 10.7 | 38.83 |
| PlayVibe | US | Active | 4 Drawer Puzzle Board 1500 | B0B9MMLD3P PV0509 | | 753 | 0 | 1591 | | | | 15600 | 9/15/22 | 11.98 | 1.54 | 13.52 |
| PlayVibe | US | To be discontinued | Balance Board | B0BK2LFN PV0512 | | 15 | 0 | 1128 | | | | | | 10.01 | 1.57 | 11.58 |
| PlayVibe | US | Discontinued | 1500pc Puzzle | B0BNLC9RN3 PV0507 | | 0 | 0 | | | | | | | 10.01 | 1.57 | 11.58 |
| PlayVibe | US | Active | 1000pc Puzzle | B0BNLC9RN3 PV0511 | | 17 | 0 | | | | | | | 10.01 | 1.56 | 10.45 |
| PlayVibe | US | Active | Puzzle board 1500 | B0BLA1F3P PV0506 | | 2009 | 0 | 1404 | 324 | 5850 | 8/30/23 | 11600 | 9/20/23-10/10/23 | 11.57 | 2.88 | 10.45 |
| PlayVibe | US | Active | Princess bed WITH rug | B0BLBJKZF5 PV0505 | | 1015 | 0 | 961 | 9800 | | | 11600 | 9/26/23 | 10.15 | 0.63 | 10.78 |
| PlayVibe | US | Active | Teepee Tent | B0BLCZ4V1 PV0504 | | 178 | 0 | 2200 | 43 | | | | | 9.82 | 5.80 | 16.45 |
| PlayVibe | US | Active | Guest 4 to Score | B0C1HHN2XM PV0524 | | 398 | 0 | | | | | | | 36.21 | 6.13 | 44.33 |
| PlayVibe | US | Active | Giant 4 to Score | B0C1HHN2XM PV0502 | | 85 | 0 | | | | | | | 42.22 | 6.45 | 49.07 |
| PlayVibe | US | To be discontinued | 6pc Dinosaur car Set | B0BLZLYZHN PV0503 | | 7410 | 0 | | | | | | | 1.91 | 0.23 | 2.13 |
| PlayVibe | US | Active | 12pc Dinosaur Figure Set | B097VR5T65 PV0517 | | 4808 | 642 | 624 | 12450 | | 30000 | 8/15/23-9/15/23 | 3.52 | 0.36 | 3.88 |
| PlayVibe | US | To be discontinued | 6pc Dinosaur car Set | B0BK4Z5WY PV0518 | | 1611 | 0 | | | | | | | 4.15 | 0.27 | 4.42 |
| PlayVibe | US | Active | Binoculars Pink | B0BK4ZP5T3 PV014 | | 153 | 0 | | | | | | | 4.15 | 0.27 | 4.42 |
| PlayVibe | US | To be discontinued | Binoculars Blue | B0C6456WMG PV004 | | 3011 | 0 | 10664 | | | | | | 1.61 | 0.42 | 2.03 |
| PlayVibe | US | Active | Jumbo Crayons | B0BK4ZP5F3 PV014 | | 3468 | 4 | 6350 | | 25000 | | 9/15/23 | 1.31 | 0.11 | 1.42 |
| PlayVibe | US | Discontinued | Dinosaur Play Set | B0BK4ZMRTL PV002 | | 901 | 53 | 30000 | | | | | | 3.69 | 0.13 | 3.82 |
| PlayVibe | US | To be discontinued | Puzzle Sheets | B0BK2MPP1G PV002 | | 380 | 0 | 6870 | | | | | | 1.8 | 0.12 | 1.92 |
| PlayVibe | US | To be discontinued | Binoculars Green | B0BK4ZR33 PV007 | | 10 | 0 | | | | | | | 4.15 | 0.27 | 4.42 |
| PlayVibe | US | To be discontinued | Binoculars Purple | B0BK4Z3LCK PV002 | | 289 | 0 | 754 | | | | | | 4.15 | 0.27 | 4.42 |
| PlayVibe | US | To be discontinued | Binoculars Blue | B0BK4F3MRM PV001 | | 960 | 0 | 40 | | | | | | 4.15 | 0.27 | 4.42 |
| PlayVibe | US | Discontinued | | X0026VK4D5 PV007 | | 0 | 0 | | | | | | | 1.31 | | 1.31 |
| PlayVibe | US | Active | 60pc Magnetic Tiles | B0RL9FFR8Z PV015 | | 4295 | 0 | 1196 | | | | 28160 | 8/15/23 | 39.2 | 6.85 | 46.05 |
| PlayVibe | US | To be discontinued | Puzzle board Spinning 1500 | B0BRH7MU71 PV012 | | 577 | 0 | 28 | 42 | | | | | 20.1 | 8.18 | 28.28 |
| PlayVibe | US | To be discontinued | Puzzle board with Table 1500 | B0BH7NY0Y1 PV011 | | 0 | 0 | 66 | 150 | | | | | 11.21 | 1.05 | 12.26 |
| PlayVibe | US | Active | Balance Board | X0023GPC9N PV009 | | 0 | 0 | 4 | | | | | | 10.01 | 1.57 | 11.58 |
| PlayVibe | US | To be discontinued | 1500pc Puzzle | B0BH4XN9 PV007 | | 10 | 0 | | | | | | | 4.15 | 4.15 | 4.15 |
| PlayVibe | US | Discontinued | | B0BKFPMB9P PV008 | | 0 | 0 | | | | | | | 4.15 | | 22.98 |
| PlayVibe | US | Active | | B0RL8FFYOC PV003 | | 0 | 0 | | | | | | | 18.83 | 4.15 | 22.98 |
| PlayVibe | US | Discontinued | | B0RL8FFKR1 PV001 | | 0 | 0 | | | | | | | 18.83 | 4.15 | 17.65 |
| PlayVibe | US | Active | Princess bed WITHOUT rug | B09MJLCV9V PV017 | | 2664 | 0 | 161 | | 7631 | 8/20/23 | 7631 | 9/5/23 | 7.69 | 1.83 | 9.62 |
| PlayVibe | US | Discontinued | Dinosaur Play Set | B09WK3LDZP PV004 | | 784 | 0 | | | | | | | 4.22 | 0.42 | 4.37 |
| PlayVibe | US | Active | | X0026VKVL PV017 | | 0 | 0 | | | | | | | 0.79 | | |
| PlayVibe | US | Active | 130pc Forts | B0BLTM4Z2W PV007B | | 779 | 0 | 920 | | 11200 | 8/30/23 | | 11.57 | 1.57 | 11.58 |
| PlayVibe | US | Active | 8pc Dinosaur car Set | B09RCBRPQM PV03A | | 2133 | 0 | | | | | | | 3.39 | 0.50 | 3.39 |
| PlayVibe | US | To be discontinued | Chess/Checker Set | B09RCDV6PP PV03A | | 8396 | 126 | 214 | 11600 | | 23900 | 8/6/23-9/5/23 | 6.18 | 0.36 | 6.14 |
| PlayVibe | US | Active | Chess/Checker Set | B09RMCS9M PV002 | | 167 | 20 | | | | | | | 6.38 | 0.36 | 6.74 |
| PlayVibe | US | To be discontinued | Walkie Talkie - 3/2 Blue/Pink | B09RAC4Z8B PV08 | | 87 | 0 | 252 | | | | | | 7.2 | 0.48 | 7.68 |
| PlayVibe | US | To be discontinued | Chess/Checker Set | B09R4WV178 PV07 | | 0 | 0 | | | | | | | 7.2 | 0.48 | 7.68 |
| PlayVibe | US | To be discontinued | Walkie Talkie - 3/2 Pink | B09R4WV5 PV06 | | 0 | 0 | 366 | | | | | | 7.2 | 0.48 | 7.68 |
| PlayVibe | US | To be discontinued | Walkie Talkie - 3/2 Blue | B09R4FQ4HO PV06 | | 65 | 0 | | | | | | | 0.48 | 0.48 | 7.68 |

| | | | | **TOTAL UNITS** | | In Amazon 49,564 | Inbounding 23,539 | 3PL Inventory (FP EA) 53,436 | Other 3PL, Inventory (FR PA) | | **TOTAL UNITS** 126,559 | | | | | | |
| | | | | Inventory value | $345,910 | $3,630 | $369,078 | $271,171 | | Depletion value | $311,047 | | | | | | |
| | | | | | | | | | | Balance value | $1,346,553 | | | | | | |
| | | | | | | | | | | **Total** | $1,678,100 | | | | | | |

**Total on hand inventory value: $993,750**

Open FOB deposits (paid from Go North Treasury)

Production FOB deposit 217,512

Summary (APA Ltd)

**Schedule 2.2 – Assets which are not part of Go North' acquisition**

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

**Schedule 2.5- Assumed Liabilities**

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

**Schedule 3.1 – Calculation of Net Profit**

The Net Profit shall be determined according to the below formula;

*Net Profit = A – B – C – D – E*

where,

| | |
|---|---|
| A | is the revenue of the Business attributable to the Business during a period of twelve months following the Closing Date, as established in Amazon's report from the applicable Seller Central Account (i.e. the Amazon Total Income) minus refunds for the same period |
| B | is the Amazon Total Expenses (as established in Amazon's report from the applicable Seller Central Account) |
| C | is the manufacturing and shipping costs of the products sold during the same period (excluding costs already included in the Amazon Total Expenses) |
| D | is the 3PL (warehouse) costs of the Business during the same period |
| E | is costs for adverting and branding (excluding costs already included in the Amazon Total Expenses) in relation to the Business during the same period; and |

Schedule 3.2

- Operate the Business as previously (based on the Seller's sole discretion)
- Forecasting inventory
- Buying the inventory
- Importing inventory
- Maintaining stock levels in FBA
- Optimizing prices according to our experience to maintain optimal selling levels & to maintain organic spots
- Creating deals & coupons as needed
- Amazon PPC as necessary
- Buyer communication

**Schedule 3.9 Purchase Price Allocation**

Closing Inventory Value (as finally determined) to Inventory

Balance of the Purchase Price to Goodwill.

This document is signed using GetAccept Digital Signature Technology.
Fingerprint: 83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea101f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

# Signature Certificate

Document name:
**APA - Go North PlayVibe**

Unique document ID:
c42f08c9-b9f3-4e3f-bece-785fa6a3df37

Document fingerprint:
83e03de65a91e0d07b361a9fbb49b70ecb445d41a2eb3bd0a4469a57f6b1b92037be335576db47ea10
1f09d3f9e799c861ceb6125df0757fc5972f796ac735c0

## Signatories



### David Berkowitz
**BSB Industries LLC,**

Email: david@masterdealsusa.com
Device: Edge 115.0.1901.200 on Unknown Windows 10.0
(desktop)
IP number: 104.246.108.215

Trusted timestamp:
2023-08-11 13:59:13 UTC



### Johan Hallenby
CEO
**Go North Group AB (559252-2188)**

Email: johan.hallenby@gonorth.co
Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7
(desktop)
IP number: 98.128.213.122

Trusted timestamp:
2023-08-11 14:04:50 UTC



### Wilhelm Bergman
M&A Manager
**Go North NMA (559252-2188)**

Email: wilhelm.bergman@gonorth.co
Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7
(desktop)
IP number: 98.128.213.122

Verified with login

Trusted timestamp:
2023-08-11 13:56:39 UTC

This document was completed by all parties on:

**2023-08-11 14:04:50 UTC**



# Audit log

| Trusted timestamp | Event with collected audit data |
|---|---|
| 2023-08-11 14:04:50 UTC | Document was signed by Johan Hallenby (johan.hallenby@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 14:04:39 UTC | Document was reviewed by Johan Hallenby (johan.hallenby@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 14:04:12 UTC | Document was opened by Johan Hallenby (johan.hallenby@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:59:13 UTC | Document was signed by David Berkowitz (david@masterdealsusa.com)<br>Device: Edge 115.0.1901.200 on Unknown Windows 10.0 (computer)<br>IP number: 104.246.108.215 - IP Location: Monroe, United States |
| 2023-08-11 13:57:13 UTC | Document was opened by David Berkowitz (david@masterdealsusa.com)<br>Device: Safari 16.6 on iPhone iOS 16.6 (smartphone)<br>IP number: 169.61.99.57 - IP Location: Brooklyn, United States |
| 2023-08-11 13:56:48 UTC | Document was sent to Roger Cohen (roger.cohen@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:47 UTC | Document was sent to Aaron Goodman (agoodman@nlllp.com)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:45 UTC | Document was sent to Johan Hallenby (johan.hallenby@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:43 UTC | Document was sent to David Berkowitz (david@masterdealsusa.com)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:40 UTC | Document was sealed by Wilhelm Bergman (wilhelm.bergman@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:39 UTC | Document was signed by Wilhelm Bergman (wilhelm.bergman@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |
| 2023-08-11 13:56:12 UTC | Document was created by Wilhelm Bergman (wilhelm.bergman@gonorth.co)<br>Device: Chrome 115.0.0.0 on Unknown macOS 10.15.7 (computer)<br>IP number: 98.128.213.122 - IP Location: Rockneby, Sweden |



This document is signed using GetAccept Digital Signature Technology.
This Signature Certificate provides all signatures connected to this document and the audit log.